# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RECEIVERSHIP MANAGEMENT, INC. IN ITS CAPACITY AS INDEPENDENT FIDUCIARY OF THE AEU HOLDINGS, LLC EMPLOYEE BENEFIT PLAN, | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Case No.** _____ |
| AEU HOLDINGS, LLC, STEPHEN M. SATLER, STEVEN GOLDBERG, and BILLIE KATHRYN WHEELER WRAY, | ) ) ) ) ) | **JURY DEMAND** |
| **Defendants.** | ) | |

## COMPLAINT

This case is about a failed health benefits plan -- the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"), and its Participating Plans.[1] Plaintiff Receivership Management, Inc. is the court-appointed Independent Fiduciary of the AEU Plan and its Participating Plans ("Independent Fiduciary") and brings, in that capacity, the following claims against AEU Holdings, LLC, Stephen M. Satler, Steven Goldberg, and Billie Kathryn Wheeler Wray. In support thereof, the Independent Fiduciary alleges as follows.

---

[1] The AEU Plan is a named defendant in the related and pending case filed in this Court by the Secretary of the U.S. Department of Labor (Acosta v. AEU Benefits, LLC, et al., United States District Court for the Northern District of Illinois Case Number 1:17-cv-07931-JHL/SMF (hereinafter, the "DOL Action"). The "Participating Plans" are those failed health benefit plans that were part of the AEU Plan by virtue of their participation in the AEU Plan, as set forth in the Secretary's pleadings and in the orders issued by the Court in the DOL Action. (See, e.g., First Amended Complaint in DOL Action (D.E. #190) at ¶ 15 and Preliminary Injunction in DOL Action (D.E. #59) at pp. 1-2).

## PARTIES

1.      Independent Fiduciary is a Tennessee corporation with its principal place of business in Nashville, Tennessee.  Independent Fiduciary was appointed as such by the Court in the related and pending DOL Action.

2.      Defendant AEU Holdings, LLC ("AEUH") is a Delaware limited liability company with its principal place of business in Texas.

3.      Defendant Stephen M. Satler ("Satler") is an individual who is a citizen of New Jersey.  At all times relevant to this Complaint, Satler was the Chief Executive Officer and significant owner (i.e., an approximate 22% owner) of AEUH, and a member of the Board of Managers of AEUH.

4.      Defendant Steven Goldberg ("Goldberg") is an individual who is a citizen of Texas.  At all times relevant to this Complaint, Goldberg was the Chief Operating Officer and significant owner (i.e., an approximate 22% owner) of AEUH and a member of the Board of Managers of AEUH.

5.      Defendant Billie Kathryn Wheeler Wray ("Wray") is an individual who is a citizen of Louisiana.  At all times relevant to this Complaint, Wray was the in-house general counsel for AEUH and its subsidiaries.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this Complaint under 28 U.S.C. section 1332 because the parties are diverse since they are citizens of different states and the amount in controversy, i.e., the damages sought by the Independent Fiduciary exclusive of interest and costs are in excess of $75,000.00.

2

7.     This Court has personal jurisdiction over Defendants because Defendants have the requisite minimum contacts to subject themselves to jurisdiction in this Court.

8.     Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. section 1391(b)(2) because a substantial part of the events, acts, transactions and occurrences giving rise to the claims alleged in this Complaint occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

*Appointment and Authority of Independent Fiduciary*

9.     On November 2, 2017, the Secretary of Labor filed the DOL Action against various entities.

10.     On November 3, 2017, the court in the DOL Action entered an Ex Parte Temporary Restraining Order ("TRO").

11.     The TRO defined the AEU Holdings, LLC Employee Benefit Plan as the "AEU Plan" and further defined all health benefit plans that are part of or participate in the AEU Plan to be "Participating Plans."   The TRO ordered, in part, that Receivership Management, Inc., was appointed as the independent fiduciary to the AEU Plan and Participating Plans.

12.     On December 13, 2017, the court in the DOL Action entered a Preliminary Injunction ("Preliminary Injunction"; D.E.#59 in DOL Action).   The Preliminary Injunction ordered, in part, that the Independent Fiduciary shall remain as the Independent Fiduciary to the AEU Plan and Participating Plans, serve as the successor Trustee and Plan Administrator of the AEU Plan, and shall have full and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets.   Preliminary Injunction ¶ 4. The Preliminary Injunction further gave the Independent Fiduciary "[a]uthority to exercise all

fiduciary responsibilities relating to the Participating Plans and the AEU Plan, including, but not limited to, the responsibility to act as the administrator of the Participating Plans and the AEU Plan." Id. ¶ 14(a)

13.     The Preliminary Injunction gives the Independent Fiduciary, among other authorities, the "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan[.]" Preliminary Injunction ¶ 14(j).

14.     The related DOL Action remains pending before the U.S. District Court for the Northern District of Illinois.

15.     AEU Benefits, LLC ("AEUB") is a wholly-owned subsidiary of AEUH. The names AEU Holdings and AEU Benefits are used interchangeably on various AEU Plan documents, with the shortened form "AEU" also being used frequently in documents and by the Defendants themselves as well as other officers and employees of AEUH and AEUB. Accordingly, unless specifically denoted otherwise, the term "AEU" used in this Complaint refers to AEUH and AEUB collectively.

***General Features and Structure of the AEU Program***

16.     Prior to 2015, a company named ALLInsurance Solutions Management, LLC ("AISM"), operated and administered a self-funded health benefits program platform. The AISM program platform focused on providing health benefits coverage for professional employer organizations ("PEOs") and Administrative Services Only ("ASO") arrangements.

17.     In July 2015, AISM engaged AEU to manage the AISM program platform. AEU managed that program platform from July 2015 to late-April 2016 and was paid fees for such services.

18. In late-April 2016, AEU acquired the AISM program platform pursuant to an Asset Purchase Agreement dated April 26, 2016. Under the Asset Purchase Agreement, AEU purchased AISM's business, assets, and property. AISM's assets included the AISM program platform. Via the Asset Purchase Agreement, AEU purchased the assets associated with the AISM program platform and took over the sales, marketing, underwriting, rating, claims handling, and program administration and advisory functions. This self-funded health benefits program platform is referred to herein as the "AEU Program."

19. Defendants negligently failed to take action to ensure the viability of the AEU Program. Defendants purported to establish the AEU Program as a health benefits plan for the Participating Plans, but negligently failed to do the necessary steps to correct the problems discussed below.

20. The AEU Program engaged aggregators and brokers to market, recruit, and enroll participating employers in the AEU Program.

21. Under the AEU Program, each participating employer was to provide health benefits solely for its own employees and, if any, their respective spouses and dependents.

22. The employer health benefit programs participating in the AEU Program are referred to herein as the "Participating Plans."

23. Defendants knew or should have known that each participating employer was to establish a voluntary employees' beneficiary association ("VEBA") trust for its specific Participating Plan. The Defendants knew or should have known that each trust was to become a tax-exempt organization as a "voluntary employees' beneficiary association" under Section 501(c)(9) of the Internal Revenue Code (IRC), 26 U.S.C. section 501(c)(9). Defendants knew or

should have known that the participating employer's VEBA trust was to serve as that employer's health benefits program.

24.      Defendants knew or should have known that to become a lawful and authorized VEBA trust under Section 501(c)(9) of the IRC, each employer had to satisfy the following requirements:

- The assets must be held in trust for the "members" of the trust, i.e., there must be separate accounts for each VEBA.

- There must be an organization of associated employees.  Eligibility for membership must be defined by reference to objective standards that constitute an employment-related common bond among such individuals.  Employees of one or more unaffiliated employers engaged in the same line of business "in the same geographic locale" would be considered as having an employment-related common bond.

- None of the benefits can inure to private shareholders or individuals.

- The VEBA must file a Form 1024 notice with the IRS and then receive a determination from the IRS that the entity is qualified under IRC § 501(c)(9).

- The association of employees must be made up of no more than 10 percent ownership.  Thus, if there are nine or less participants in the alleged VEBA, if one of them is the owner, it cannot be a VEBA.

25.      Defendants provided to each employer documents which Defendants knew or should have known were required to be completed, executed, and/or received by each Participating Plan to be in the AEU Program.  The documents were as follows:

- VEBA Trust Agreement
- Program Advisory Services Agreement
- Collection Agreement with aggregator
- Certificate from Bermuda purchasing trust
- Plan Administrator Services Agreement

26.      But as Defendants knew or should have known, many employers never signed/executed/received the required documents related to the AEU Program.

27. Defendants were to manage administrative functions for the AEU Program, provide underwriting for the AEU Program, and provide overall management to the AEU Program.

28. The sales and marketing of the AEU Program was centralized at AEU so that all marketing material could be controlled by AEU to ensure that accurate information was provided to employers by aggregators and brokers. AEU directed marketing of the AEU Program toward distribution points where a large number of employers could be accessed at one time, e.g., PEOs, associations, and other aggregators, although the AEU Program was also marketed and sold to individual employers.

29. AEU provided a "VEBA Tool Kit Presentation" to aggregators and brokers to provide to employers describing the VEBA product, how premium equivalents (employer/ employee contributions) are collected, how claims are paid, and the benefits versus fully insured plans. The toolkit included a power point presentation which stated that the Program was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the Program was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda."

30. Defendants prepared and used "Underwriting Guidelines" for the AEU Program. The Underwriting Guidelines stated as follows regarding minimum participation by employers: "Minimum of 5 active full time employees needed to provide a proposal." The Underwriting Guidelines also stated that participation requirements were based on the size, i.e., number of full-time employees, in the group. For groups in which employees contributed toward the cost of the coverage, the document required 100 percent participation for groups of 5 lives, "100 less one" percent for groups of 6 to 9 lives, and 75 percent participation for groups of 10 and over.

31.     The AEU Program was marketed by Defendants as including the purchase of insurance via a Bermuda insurance captive.  Each Participating Plan was to join a Bermuda purchasing trust ("BPT") located in and formed under the laws of Bermuda, which trust was to indemnify and stand behind each Participating Plan's claim obligations.  The BPT was to produce a certificate to each Participating Plan evidencing such indemnity obligation.  The BPT was to purchase insurance coverage to back its indemnity obligations to each Participating Plan. Under the AEU Program's intended structure, Participating Plans would be co-beneficiaries of a single BPT.  The specific BPT, in turn, was to purchase a Primary Policy and an Excess Stop-Loss Policy with the BPT listed as the named insured for the benefit of each of its beneficiaries. This arrangement was to give each Participating Plan the right to receive payments from claims made against the Primary and Excess Stop-Loss policies for health care costs of the Participating Plan's covered employees. The AEU Program's designated administrative representative used a portion of the contributions collected from the Participating Plans to fund the purchase of insurance by the BPT.

32.     The VEBA Trust Agreement for each specific VEBA Trust stated, in part, as follows related to contributions by the employer and employees:

> RECEIPT OF FUNDS.  All monetary employee and dependent contributions received by the Trust shall be deposited through the Plan Administrator in a bank or banks located in the jurisdiction of the Sponsor's, the Plan Administrator's principal place of business or the District of Columbia as agreed by the Trustee(s) . . . .
>
> * * * *
>
> COLLECTION OF CONTRIBUTIONS.
>
> (a)     ***All Sponsor contributions and all Employee Participants' contributions shall be deposited in the bank accounts for the Trust, which may be an escrow account maintained by the Plan Administrator***.  All contributions so received, together with the income therefore shall be held, and may be invested

and reinvested, and shall be administered by the Trustees pursuant to the terms of this Agreement.

(b)     The Trustee(s) and the actuaries providing services relating to the Plan shall determine the expected costs of the benefits provided under the Plan and the administration of the Trust. The Trustee(s) or the Plan Administrator as designee and its agents shall fix the amount of contributions for the costs of benefits provided under the Plan for eligible employees and their eligible dependents and the administration costs and expenses of the Plan. . . .

* * * *

(d)     The Trustee(s), or the Plan Administrator as designee, are specifically authorized to determine the required amount of contributions to pay the expected cost of benefit provided under the Plan and the cost of administration of the Trust and Plan based on the number of eligible employee and dependent, and any other relevant factors. . . . .

VEBA Trust Agreement Art. II §4 & Art. IV § 2(a), (d) (emphasis added).

33.     None of the Defendants were a party to any VEBA Trust Agreement, but Defendants owed duties to the AEU Program to ensure that its structure was consistent with the requirements in the VEBA Trust Agreement.

***Defendants' Negligent Actions and Inactions Caused the Failure of the AEU Program***

34.     AEUH managed and administered the AEU Program and, at all relevant times, owed a duty of care to the AEU Program.

35.     As the Chief Executive Officer and shareholder of AEUH and a member of the Board of Managers of AEUH, Satler, at all relevant times, owed a duty of care to the AEU Program.

36.     As the Chief Operating Officer and shareholder of AEUH and a member of the Board of Managers of AEUH, Goldberg, at all relevant times, owed a duty of care to the AEU Program.

37.     Wray was in-house general counsel for AEUH at all relevant times beginning no later than June 2015 and continuing through when she left her employment at AEUH on July 1, 2017.  Wray, at all relevant times, owed a duty of care to the AEU Program.

38.     Wray was first licensed to practice law in 2014 and became general counsel for AEUH less than a year after first being licensed to practice law.  Wray's duties, as stated by her in a document entitled "General Counsel Position Description," included the following duties:

- "[E]nsure the company is operating legally at all times."

- "[B]e aware of all transactions of the company from the beginning as this will limit the Company's legal risk."

- "Work with the executive team to ensure that the company is always in compliance with industry employment and business process law."

- "Provide accurate legal guidance to the executive staff on all matter[s]."

39.     At the time Wray became the general counsel for AEUH, Wray had no experience regarding advising and structuring a health benefits program and no experience regarding compliance related to VEBAs under Section 501(c)(9) of the Internal Revenue Code (IRC).  Wray admitted she knew little, if anything, about VEBAs in an email on October 3, 2016, in which she asked Tom Stoughton at S.D. Trust Advisers (an entity involved in the AEU Program), "Where would you suggest I begin/continue my legal VEBA education?"

40.     Defendants committed numerous acts of negligence which breached general duties of care owed by Defendants to the AEU Program.

41.     Defendants failed to operate the AEU Program in accordance with the documents and requirements associated with the AEU Program.  As the problems discussed below became evident to Defendants, they failed to take action to fix and correct the problems.

**A.** **Defendants Negligently Failed to Ensure the Proper Set Up of the AEU Program and/or to Correct Matters Regarding the Set Up of the AEU Program.**

42. The Defendants did not ensure that the structural requirements in the VEBA Trust Agreement were met.

43. Each Participating Plan's VEBA trust was required to complete certain documentation, obtain an employer identification number, and obtain a certificate from their respective BPT, but almost none of them did so.

44. As of March 2017, Defendants had learned sufficient information such that they knew or should have known that the AEU Program was being operated improperly without the requirements being met. Defendants failed to take actions to correct the problems. Had Defendants taken action to correct the problems, the AEU Program would not have incurred the millions of dollars of unpaid claims that it incurred which are presently outstanding.

45. In or around March 2017, Wray began to set up the onboarding process for new employers to follow. Wray set up the onboarding process so that employers could complete the required documents in order to be a VEBA trust in the AEU Program:

- Program Advisory Services Agreement

- Collection Agreement with Aggregator

- Certificate from BPT

- Plan Administrator Services Agreement

- Small Employers Business Trust Agreement Form

Defendants, however, failed to ensure that the AEU Program had all required documents completed for each Participating Plan. Defendants also failed to ensure that each Participating

Plan completed and filed a Form 1024 with the IRS and obtained IRS approval of such Participating Plan's status as a VEBA under IRC Section 501(c)(9).

46.     Defendants failed to take action on behalf of the AEU Program to ensure that the Participating Plans set up separate bank accounts, issued and obtained certificates from the Bermuda purchasing trust, filed IRS Form 1024s, and obtained approvals from the IRS that specific VEBAs qualified as such.   Wray worked on automating the completion of the documents by each Participating Plan, but Defendants did not do anything regarding requiring separate bank accounts/accounting by each Participating Plan, ensuring each Participating Plan submitted a Form 1024 to the IRS and obtained approval of the VEBA trust from the IRS, or ensuring that Bermuda certificates were issued and delivered to each Participating Plan.

47.     There are numerous instances documented in emails where Defendants admitted knowing that the Participating Plans were not in compliance with the AEU Program's structural requirements.   Notwithstanding such knowledge, Defendants negligently failed to take action to ensure compliance with the structural requirements, and improperly continued accepting employer contributions and allowing Participant Plans to incur claims.

48.     Defendants knew that each Participating Plan's VEBA trust needed to obtain a certificate from its respective BPT, but failed to ensure that the certificates were issued.   An email to Wray on April 14, 2017 from Tom Stoughton (forwarding an email from the Bermuda firm that issued such certificates) confirmed Wray's failure to ensure that the Participating Plans obtained certificates issued by the Bermuda trusts:

> I haven't heard from you in awhile and I still haven't received anymore certificates which were promised in October 2016.
> **The last certificates that I received were for January 2016** and I'm sure that more Veba Trust certificates have been issued since January 2016.
> It is of paramount importance that we receive the certificates.
> Do not hesitate to contact me should you have any questions.   (emphasis added)

That email was copied to Satler and forwarded to Goldberg. Defendants, therefore, knew in April 2017 that no certificates had been provided to any purported VEBA trust since **_January 2016_**. Wray never ensured that the AEU Program had received the certificates issued for the purported VEBA trusts in the AEU Program.

49.     Defendants knew, in April 2017, that the AEU Program's structure suffered from the lack of having proper documentation regarding the purported VEBA trusts.

50.     Wray's reaction to this knowledge was to email Defendant Satler and Tom Stoughton at S.D. Trust Advisors, on April 11, 2017, that "**_while this documentation is absolutely important it is not the end of the world if its not completed_**." Wray was negligent in making this statement; the documentation was essential for the proper operation of the AEU Program and employer/employee contributions should not have been accepted without the proper documentation being completed and received by the Participating Plans.

51.     Wray realized a day later that her statement quoted in the paragraph above was incorrect. On April 12, 2017, she drafted an email to go to Participating Plans asking them to complete the required documentation. She sent that draft email to Rod and Anna Maynor at aggregator Black Wolf Consulting, Inc. ("BWC"), asking them to review the draft letter and send Wray the email addresses for the Participating Plans.

52.     Defendants knew and understood the importance of having the documents completed, but still failed to ensure that the required trust documents were completed, the certificates from the respective BPT were received, the IRS Form 1024s were submitted, and IRS approvals of the VEBA trusts were obtained.

53.     None of the Participating Plans' purported VEBA trusts filed a Form 1024 notice with the IRS and, therefore, none received any determination from the IRS that the entity was qualified under IRC § 501(c)(9).

54.     Tom Stoughton reaffirmed to Defendants the requirement that the proper documentation and underwriting be done.  In an email to Defendants on April 24, 2017, Stoughton made clear that the AEU Program structure was not complied with and that no plan existed until it was fully underwritten and documented, stating:

> NO PLAN EXISTS AND YOU SHOULD NOT BE TAKING ANY FUNDS FROM ANY PLAN UNTIL IT IS FULLY UNDERWRITTEN, AND FULLY DOCUMENTED AND ALL DOCUMENTS, INCLUDING PLAN DOCUMENTS, SPD'S AND SBC'S ARE COMPLETED AND ON FILE FOR REVIEW.  (emphasis in original)

55.     Defendants knew that hundreds of employers had failed to complete the proper documents.  But even though the paperwork of many employers was not done and even though Defendants had been advised by Tom Stoughton that the AEU Program should not be accepting contributions from employers until the required documentation was completed, Defendants continued to allow contributions into the AEU Program from the Participating Plans.  Wray believed that it was permitted for the AEU Program to continue taking the money of those employers as shown by her statement in a May 2, 2017 email copied to Satler and Goldberg that, "*I do not believe we should not take money because paperwork is not done.*" (emphasis added).

56.     In August 2017, Tom Stoughton confirmed in an email to new AEU general counsel Sandie Darling that it was Wray who was responsible for getting all the required documentation done:

> . . . *Billie was responsible for documentation and started the process but I don't know what she completed and what she did not.*  I think that we should discuss, as I am not aware of ANY process by which documents are executed or how/when groups are added.  (bold and italics added; caps in original)

57.     The vast majority of the Participating Plans had not completed and obtained the required documents to be set up in the AEU Program.  Soon after Wray left her employment with AEUH, Wray reported the following information in an email to new AEU general counsel Sandie Darling:  BPT1 had 683 sponsor companies of which only 128 had signed trust documents, and 574 had employer identification numbers (EINs); and BPT2 had 220 sponsor companies of which only 14 had signed trust documents and none had EINs.  Thus, even though Defendants were responsible to ensure that the AEU Program was properly set up including that Participating Plans were properly documented, Defendants failed to do so.  The Participating Plans did not establish lawful VEBA trusts.  The Defendants should have never allowed the AEU Program to accept employer/employee contributions or incur claims related to such Participating Plans.

**B.      Defendants Were Negligent in Allowing/Not Prohibiting the Improper Commingling of the Participating Plans' Funds.**

58.     Defendants knew from the VEBA Trust Agreement that each Participating Plan's contributions were to be separated or, at a minimum, accounted for separately.  The VEBA Trust Agreement required that each employer set up a separate VEBA trust with separate accounts and accounting.

59.     Defendants also knew that the AEU Program was not in compliance with the VEBA Trust Agreement if contributions from Participating Plans were commingled and pooled together instead of being maintained and accounted for separately.

60.     Defendants knew that each Participating Plan was to set up and have its own accounting and that each Participating Plan was to deposit its contributions into its own account.  Even so, Defendants knew of, approved, and enabled the AEU Program's commingling and

pooling of all of the Participating Plans' contributions and further approved the use of the commingled and pooled funds to pay claims of all Participating Plans together and collectively without differentiation by Participating Plan.

61.     Contrary to the requirements in the VEBA Trust Agreement, there were no separate accounts for each purported Participating Plan.  Instead, (i) aggregators invoiced the employers, (ii) aggregators received employer contribution payments into the aggregators' bank accounts and not a bank account for each trust, (iii) aggregators took a portion of the employer contributions to pay themselves and their brokers, and (iv) aggregators sent the remainder to the AEU Program's designated administrative representative's bank account.

62.     Thus, in the AEU Program, as operated by Defendants, contributions from Participating Plans were commingled and pooled with funds from other Participating Plans.  The contributions from employer Participating Plans were first commingled and pooled in aggregator bank accounts where the aggregators deducted their own fees and broker commissions.  The remaining contribution amounts were then commingled and pooled in the bank accounts of the AEU Program's designated administrative representative from which fees were withdrawn for AEU, the designated administrative representative, and the TPAs.  The remaining contributions were then commingled and pooled in the Bermuda accounts.

63.     The Defendants knew that claims were not paid by TPAs solely for each separate purported VEBA trust, but were paid from commingled and pooled funds by TPAs based on which providers or claimants were complaining the loudest about claims not being paid, including threatening or filing litigation.

64.     By April 2017, Defendants knew of the commingling and pooling of the contributions from Participating Plans.  Defendants did not take any corrective actions even though this was not allowed under the AEU Program.

65.     The pooling of contributions and collective payment of claims meant that the AEU Program, as operated by Defendants, and contrary to the VEBA Trust Agreement and AEU Program documents, functioned more like traditional health insurance than a self-funded plan under which the individual employer remains liable for claims in excess of contribution amounts and stop-loss payments.  But the Defendants had not had the AEU Program underwritten or rated like traditional health insurance.  Defendants failed to properly underwrite the AEU Program or have sufficient rates charged, especially considering the excessive fees deducted from employer contributions at every stage of the process.  As a result, the AEU Program was grossly underfunded and incurred millions of dollars of claims which it is unable to pay, all as a result of the Defendants' negligent actions and inactions.

**C.     Defendants Negligently Allowed Aggregators to Deduct Their Fees From Participating Plan Contributions.**

66.     Defendants knew that **all** contributions from each employer were required to go to the Participating Plan's separate account, but knew that was not how the AEU Program was being operated.  When Anna Maynor of BWC asked Wray in an email on June 20, 2017 if they needed to give each employer its own loss run, Wray responded as follows:

> Technically yes.
> This is one of the things I spoke to Rod about.
> ***The Plan Administrator is supposed to have an accounting of each trust.***
> ***All the money collected (yes All) should be deposited in the trust.***
> (emphasis added)

67.     Despite knowing that "All" money collected was to be placed in the separate purported VEBA trusts' accounts, Defendants knew that aggregators were routinely, if not

without exception, deducting fees from the employer contributions and that what was being contributed were employer contribution amounts net of the aggregators' fees and commissions. Accordingly, Defendants knew that, contrary to the way in which the AEU Program was to operate, not "All" of the employer contributions were being submitted for each purported VEBA trust.

68. The Defendants' allowance of the aggregators' withdrawal of fees and commissions from employer contributions resulted in such contributions not being available for the payment of medical claims as was required. Had those funds been available for the payment of medical claims, the AEU Program would not have suffered much of the losses and damages related to the AEU Program's unpaid and outstanding claims.

**D.    Defendants Negligently Allowed Associations and One-Person Groups to be Participating Plans.**

69. Many of the purported VEBA trusts were not organizations of associated employees as required to be a legitimate VEBA under the AEU Program.

70. Wray said in an email to Tom Stoughton on March 7, 2017 as follows:

> ***It is my understanding that each Sponsor Company must have its individual Veba, TIN, and bank account etc. and that an Association is not a Sponsor Company.*** (emphasis added)

Stoughton responded that Wray understood correctly. That email from Stoughton was forwarded to Satler and Goldberg.

71. Defendants knew that each employer needed to set up its own Participating Plan with its own VEBA trust and that groups of employers could not set up a single Participating Plan. But Defendants also knew as of that time that there were a number of associations in the AEU Program which were, in fact, set up as single purported Participating Plans.

72. Defendants, therefore, knew that if groups, i.e., associations, of employers had been set up as purported Participating Plans, each such group was not a proper VEBA trust under the AEU Program.

73. To add insult to injury, even the purported association "plans" were not properly documented because such associations in the AEU Program did not have the required documentation completed.

74. Defendants also knew that the AEU Program was not allowed to have one-person "groups" as Participating Plans, and for good reason. Covering single individuals is inherently risky, and the AEU Program was rated and underwritten for group, rather than individual, coverage. Nevertheless, Defendants knew that many such one-person employer "groups" were enrolled as Participating Plans. Defendants worked with others at AEU to send a letter to one-person employer groups informing them that they did not meet the AEU Program's underwriting guidelines and that they were terminated from the AEU Plan. The letter was sent to VEBAs with less than five employee lives enrolled. The letter stated, in part:

> The reason for our action is that, (i) under our new underwriting guidelines, effective January 1, 2017, we require each Plan to have a minimum of five employee lives participating, and (ii) our records indicate that the Cancelled Plans each have fewer than five employee lives participating.

75. Notwithstanding that letter and Defendants' knowledge that one-person employer groups were not allowed in the AEU Program, Defendants never took action to ensure that one-person groups were removed from the AEU Program.

76. In late February 2017, a broker in Bermuda named Simon Logue, who was the intermediary between the AEU Program and Lloyds of London as the stop-loss insurance carrier for BPT1, sent AEUH and S.D. Trust Advisors a list of one-person groups in BPT1. Logue sent that list because one-person groups were not allowed under the stop-loss insurance policy

underwriting criteria. After getting that list, Tom Stoughton at S.D. Trust Advisors asked that AEU "get these people out of the program." Although Wray sent emails saying that she was looking for a place to send one-person groups, Defendants never had the AEU Program take action to have such one-person groups removed from the AEU Program as had been required by the stop loss insurance policy and carrier.

77. Simon Logue followed up in an email sent on March 30, 2017 noting the requirements related to underwriting from the stop-loss insurance carrier. The list of requirements from the stop-loss carrier stated: "Removing single insureds. Please confirm this has been done." That list of requirements from the stop-loss insurance carrier also stated that "Any business that falls out of these underwriting parameters is not [to] be covered under the placement."

78. Instead of removing one-person groups from the AEU Program, Defendants allowed the existing one-person groups to remain in the AEU Program and allowed aggregators and brokers to continue placing such one-person groups in the AEU Program, even though stop-loss coverage would be not be available for those plans, contrary to how the AEU Program was marketed.

79. On April 10, 2017, Steven Nigro, an individual who was an AEUH Board member and was at the time its temporary CFO, emailed Tom Stoughton that 105 of 300 new groups had to be canceled because they were one-person groups. Instead of acting on this information, Wray rejected taking action, stating to Satler and Goldberg that Nigro's "requests fall outside of his authority" as temporary CFO and board member and "who we cancel or write is absolutely outside of [Nigro's] role and responsibilities." Thus, instead of removing one-person groups, Defendants merely discussed Nigro's role and responsibilities.

80.     Defendants failed to ensure that the AEU Program complied with the stop-loss insurance underwriting policy criteria related to one-person groups, which was a requirement based on underwriting principles and based on the AEU Program's Underwriting Guidelines. Inclusions of such risky one-person groups in contravention of the AEU Program's Underwriting Guidelines resulted in the AEU Program incurring medical claims that the AEU Program should not have incurred, thereby damaging the AEU Program through such additional medical claims, many of which remain outstanding and unpaid.

**E.      Defendants Negligently Allowed the AEU Program To Be Marketed Improperly.**

81.     Participating Plans were told by Defendants that the AEU Program was a self-funded health benefit program but were also told that the employer's monthly contribution/premium payment was the maximum cost to a Participating Plan and its employees. Each Participating Plan was supposed to be self-funded regarding all claims associated with that Participating Plan, but employers were told that all that they were required to pay was their monthly contributions, which were expressly called "premiums" even though the AEU Program was a self-funded program with stop-loss insurance. In fact, under a proper "self-funded" plan, the employer is responsible for all claims incurred in excess of the employer/employee contributions and stop-loss payments.

82.     AEU approved the marketing materials for the AEU Program. The official marketing materials for the AEU Program, approved by AEU, state that plans under the AEU Program were self-funded. The materials state that the AEU Program was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the AEU Program was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda." However,

Defendants allowed the AEU Program to be marketed as insurance that would pay all covered claims in exchange for payment of monthly insurance premiums by Participating Plans. The AEU Program should not have accepted employer/employee contributions or allowed the Participating Plans to incur claims under these circumstances.

83.     Defendants also failed to ensure that the AEU Program had an up-to-date and accurate plan document and summary plan description. In April 2016, AEU issued a Plan Document/Summary Plan Description dated January 1, 2016 entitled the "AEU Holdings, LLC Plan Document and Summary Plan Description Employee Benefit Medical Plan Effective January 1, 2016" (the "1/1/16 AEU PD/SPD"). The document was signed by Satler, dated April 15, 2016, on behalf of AEU, but had the same address as had been used for an aggregator called Veritas Benefits, LLC, in an SPD purportedly used for the AISM program.

84.     For 2016 and 2017, the AEU Program used the 1/1/16 AEU PD/SPD signed by Satler on April 15, 2016 as the PD/SPD for the AEU Plan even though it had inaccurate information set forth therein. No plan document or summary plan description had been prepared or distributed for 2017. In or about March 2017, Defendants learned that this was the PD/SPD being used by the AEU Program and knew that it was out-of-date and incorrect, but did not stop it from being used. Defendants failed to take action to replace the 1/1/16 AEU PD/SPD with a 2017 PD/SPD for the AEU Program. Instead, with Defendants' knowledge and assent, all persons in the AEU Program kept using the 1/1/16 AEU Holdings SPD or nothing at all.

**F.     Defendants Negligently Failed To Ensure That the Plans in the AEU Program Were Properly Underwritten.**

85.     Defendants negligently failed to ensure that the Participating Plans who joined the AEU Program were properly underwritten and that rates were properly set. Defendants did not underwrite every individual coming into the AEU Program. Companies were underwritten as a

group and then additional employees were accepted regardless of health status. This form of underwriting was negligent in that it failed to ensure that the appropriate and necessary rates were charged for each Participating Plan.

86.     As operated by Defendants, the AEU Program was to charge "sufficient" premiums from Participating Plans and to pool those premium contributions in order that the total would be sufficient to cover all medical claims for all Participating Plans. This model was used because Participating Plans were not established as separate accounts where each Participating Plan's contributions would be used solely for that Participating Plan's covered individuals. To successfully implement this model, premium rates had to be sufficient to cover all claims of all Participating Plans. However, the rates charged were not sufficient because of Defendants' negligence.

87.     Instead of Participating Plans being limited to a minimum of five active full-time employees, there were numerous one-person "groups" in the AEU Program, which abrogated the underwriting principles of the AEU Program. Although Defendants knew that such one-person groups were in the AEU program, Defendants failed to take action to remove all such one-person groups from the AEU Program.

88.     The premium rates charged to Participating Plans, at the direction of Defendants, were insufficient to generate the funds needed to pay the expected (and later, actual) claims costs associated with the Participating Plans in the AEU Program.

89.     Other than monthly premium payments, no additional funding was ever sought from Participating Plans to generate funds for the payment of claims even though Defendants marketed the AEU Program as a self-funded program.

*Defendants' Actions Caused Substantial Injuries in Illinois and A Substantial Part of the Events Giving Rise to the Claims Against Defendants Occurred in This District*

90.     The actions and inactions of Defendants described above harmed numerous persons who reside in Illinois.

91.     Numerous Participating Plans harmed by Defendants' actions and inactions described above are located in Illinois.

92.     Defendants marketed the AEU Program to employers in Illinois.

93.     Medical benefits coverage was provided to Participating Plans covering individuals in Illinois.

94.     Claims were paid for or denied to participants and beneficiaries in Illinois.

95.     As of October 18, 2017, participants and beneficiaries in the AEU Program included at least 1,697 Illinois residents, 229 of them being residents of Chicago.

96.     As of October 18, 2017, Illinois residents were approximately 23 percent of the participants in the AEU Program and approximately 28% of the unpaid claims.  Of all the states with residents in the AEU Program, Illinois had the largest percentage of residents in that program.

97.     Aggregator BWC was, by far, the main aggregator for the AEU Program.  The vast majority of Participating Plans in the AEU Program were enrolled by aggregator BWC.  BWC is located in and operated from Frankfort, Illinois.

98.     As of April 24, 2017, of the approximately 683 Participating Plans that aggregator BWC had enrolled in the AEU Program, 266 Participating Plans, or 39 percent, were located in Illinois with at least 62 Participating Plans located in the Chicago area.

99.     Each Defendant sent and received numerous communications (mostly emails and phone calls) directly to/from persons in Illinois regarding the actions and inactions described

above. The persons in Illinois with whom Defendants communicated were Rod and Anna Maynor at BWC as well as brokers working for the AEU Program who are located in Illinois. Hundreds, if not thousands, of emails exist between BWC and Defendants regarding the AEU Program, a large percentage of which originated in Illinois.

100. Defendants, primarily Wray, sent documents to BWC for execution by Participating Plans enrolled by BWC including the Participating Plans located in Illinois.

101. Defendants also sent communications directly to Participating Plans located in Illinois.

102. Satler and Goldberg traveled to Frankfort, Illinois in late 2016 to meet with BWC and discuss the AEU Program. Satler traveled to Illinois twice in 2017 regarding the AEU Program. On information and belief, Goldberg traveled to Illinois in 2017 regarding the AEU Program.

103. Defendants' actions and inactions, as described above, adversely affected numerous Illinois residents who were covered individuals in the Participating Plans through, among other things, non-payment of medical claims of many such individuals, increases in the premium rates charged to such Illinois residents, and termination from the AEU Program regarding many such Illinois residents.

104. In doing the actions and inactions described above, Defendants communicated numerous times with AEU Program brokers located in Illinois about issues related to the Participating Plans enrolled into the AEU Program by such brokers.

105. Defendants prepared and sent documents to Illinois aggregator BWC regarding the operations and requirements of the AEU Program which directly affected and impacted individuals in Participating Plans located in Illinois.

25

106.    Defendants' actions and inactions described above were undertaken in their capacities as the principal officers of AEUH, through which they exercised discretionary control over the AEU Program.   By virtue of their positions, Defendants had the power to decide whether to undertake such actions in and affecting the State of Illinois, and voluntarily chose to do so.   Defendants Satler and Goldberg, as substantial shareholders of AEUH, were also motivated by their personal interest in preserving their investments in those entities in undertaking the acts and omissions in and affecting the State of Illinois alleged above.

107.    Defendants' actions and inactions described above were the direct and proximate cause of injuries suffered by the individuals in Participating Plans located in Illinois which include, without limitation, failure of the AEU Program to pay covered medical claims even though such Participating Plans had paid all amounts invoiced to them by the AEU Program through Illinois-aggregator BWC.

### Damages Suffered Because of Defendants' Negligence

108.    Defendants knew that the AEU Program was not in compliance with the structural requirements for the AEU Program.   Defendants failed to take the necessary actions to correct and fix such problems.   Defendants knew that required documents were not completed and obtained and failed to correct such.   Defendants knew that minimum participation requirements were not being followed and failed to correct such.   Defendants knew that associations could not be a single Participating Plan, but also knew that the AEU Program had many such associations as purported Participating Plans and failed to correct such.

109.    Because the AEU Program was not in compliance with its required structural requirements including those from the AEU Program documents, Defendants should not have

allowed the AEU Program to continue to operate, and should have ceased accepting employer contributions and allowing the AEU Program to incur claims.

110. The December 2016 AEU Benefits, LLC Annual Financial Review and Analysis states that the Accumulated Program Deficit for the AEU Program as of the end of 2016 was $20,257,208.

111. On August 28, 2017, Windsor Strategy Partners, Inc., issued an Actuarial Opinion to AEU regarding the financial status of the AEU Program associated with BPT1. That opinion found that BPT1 had unpaid claims in the amount of $15,364,233 as of December 31, 2016.

112. As of May 12, 2017, BPT2 had unpaid claims in the amount of $2,084,375.77.

113. On June 29, 2017, BPA reported that BPT2 had unpaid claims totaling $3,196,940.66.

114. Because the pooled and commingled funds were insufficient to pay claims associated with BPT1 and BPT2, many claims were not paid.

115. As time passed and more and more claims were not paid (due to insufficient funding), employers and employees made numerous communications to their brokers and aggregators as well as to AEU and the TPAs involved that claims were not being paid.

116. The failure of the AEU Program was so bad that complaints were being made to the Department of Labor, state insurance regulators, and state attorneys general.

### COUNT

### Count I: Negligence

117. Independent Fiduciary realleges and incorporates all of the allegations above as if set forth fully herein.

118.     Defendants owed duties to the AEU Program to take actions to ensure the AEU Program complied with the VEBA Trust Agreement, IRC requirements, and the AEU Program documents.   Defendants, however, breached their duties by failing to ensure that the AEU Program complied with all such requirements in the specific ways alleged above.

119.     As AEU's in-house general counsel, Wray gave negligent advice and failed to give proper or accurate advice and take proper actions regarding the AEU Program in the specific ways alleged above.

120.     Defendants knew or should have known that the AEU Program was not being operated in accordance with its requirements and should have taken action to correct such problems, but failed to do so.

121.     Defendants also knew or should have known that the AEU Program was not being properly marketed or underwritten, and that employer/employee contributions and stop-loss payments were inadequate to cover the claims being incurred.

122.     Defendants should have shut down the AEU Program's operations, ceased accepting employer/employee contributions from Participating Plans, and ceased allowing Participating Plans to incur claims.

123.     Had it done so, the AEU Program would not have incurred the tens of millions of dollars in claims it is currently unable to pay.

124.     The actions and inactions of Defendants are the proximate and actual cause of the damages suffered by the AEU Program.

125.     Defendants, therefore, are liable for all damages to the AEU Program caused by their negligence.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully prays:

1.      That the Court award the Independent Fiduciary a judgment against Defendants, jointly and severally, in an amount to be proven at trial, including the amount of all claims that cannot be paid by the AEU Program because of insufficient funds, which damages are in the tens of millions of dollars, plus pre- and post-judgment interest;

2.      That the Court award the Independent Fiduciary its costs and expenses;

3.      That the Court award the Independent Fiduciary such other, further, and general relief to which it may be entitled and to which this Court shall deem to be just and equitable; and

4.      That a jury be empaneled to hear all issues triable to a jury in this case.

Respectfully Submitted,

**Receivership Management, Inc. In Its Capacity As the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan**

By:     /s/ Alan F. Curley
        One of Its Attorneys

Alan F. Curley (6190685)
Sam G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyco@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0020

gmatherne@wyattfirm.com
apulliam@wyattfirm.com


61787089.9