# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RECEIVERSHIP MANAGEMENT, INC.,    )
IN ITS CAPACITY AS INDEPENDENT    )
FIDUCIARY OF THE AEU HOLDINGS,    )
LLC EMPLOYEE BENEFIT PLAN    )
   )
      Plaintiff,    )   Case No. 18 C 8167
   )
      v.    )   Judge Joan H. Lefkow
   )
AEU HOLDINGS, LLC,    )
STEPHEN M. SATLER,    )
STEVEN GOLDBERG, and    )
BILLIE KATHRYN WHEELER WRAY    )
   )
      Defendants.    )

## OPINION AND ORDER

The independent fiduciary this court appointed to oversee a group of failed health benefit

plans has sued, under a negligence theory, several defendants allegedly involved in the set-up

and administration of those plans. The defendants—AEU Holdings, LLC, Stephen Satler, Steven

Goldberg, and Billie Wray (collectively, "Defendants")—now move to dismiss the complaint

and move to strike a declaration the independent fiduciary submitted in the course of briefing the

motion to dismiss. (Dkts. 19, 41.) For the reasons below, the court denies the motions.[1]

---

[1] This court has subject matter jurisdiction under 28 U.S.C. § 1332 because all defendants are citizens of different states than the plaintiff and the amount in controversy exceeds $75,000. (Dkt. 8 ¶¶ 1-6.) Venue is proper in this district, as discussed below. *Infra*, Section III.

# BACKGROUND[2]

This case arises from the failure of a large group of employee health benefit plans and a "self-funded health benefits program platform"[3] designed to serve them. (Dkt. 8 ¶¶ 16-18.) The program comprised a base level of at least 261 employer-sponsored, self-funded plans (the "Participating Plans"). (*Id.* at 1 n.1; ¶ 11.) The Participating Plans were part of or participated in an overarching health benefits plan called the AEU Holdings, LLC Employee Benefit Plan (the "AEU Plan").[4] (*Id.* at 1 n.1.) This court previously entered a preliminary injunction appointing plaintiff Receivership Management, Inc., as the independent fiduciary (the "IF") to administer the AEU Plan and the Participating Plans. *Pizzella* v. *AEU Benefits, LLC*, No. 17-cv-7931, Dkt. 49 at 3 (N.D. Ill. Dec. 13, 2017). The allegations of the IF's complaint, taken as true for purposes of the motions, are as follows:

---

[2] The following recitation of facts is taken from the IF's first amended complaint. (Dkt. 8.)

[3] The IF defines this "self-funded health benefits program platform" as the "AEU Program" and uses the term "AEU Program" extensively throughout its complaint. (Dkt. 8 ¶ 18.) The IF's use of this term is at times vague. At various points the term appears to refer to the Participating Plans and the AEU Plan (*id.* ¶¶ 34-37 (stating that Defendants "owed a duty of care to the AEU Program")); the "platform" providing services to those plans (*id.* ¶ 19 ("Defendants purported to establish the AEU Program as a health benefits plan for the Participating Plans")); and AEU Holdings and AEU Benefits (*id.* ¶ 20 ("The AEU Program engaged aggregators and brokers…")). Because the court is bound to construe the IF's complaint favorably at this stage of the litigation, the recitation of facts represents the court's best effort to make sense of the allegations referring to the "AEU Program."

[4] The IF's description of the AEU Plan relies in part on allegations in the first amended complaint filed by the Secretary of Labor in the related case *Pizzella* v. *AEU Benefits, LLC*, No. 17-cv-7931, Dkt. 190 (N.D. Ill. Oct. 9, 2018) (the "DOL Complaint"). (*See* Dkt. 8 at 1 n.1.) This creates confusion because the IF's complaint defines the AEU Plan only as a "health benefits plan" (dkt. 8 at 1), while the DOL Complaint defines the AEU Plan as a "multiple employer welfare arrangement," a defined term under ERISA that refers to a specific kind of employee welfare benefit plan. (DOL Complaint ¶ 15); 29 U.S.C. §1002(40). Thus it is unclear whether the IF means to assert that the AEU Plan is a multiple employer welfare arrangement. The distinction does not appear to be significant to the decisions on the motions.

Before 2015, the program was operated by ALLInsurance Solutions Management, LLC ("AISM"). (Dkt. 8 ¶ 16.) In July 2015, AISM engaged AEU Holdings, LLC, and its wholly-owned subsidiary AEU Benefits, LLC, to manage the AISM program platform. (*Id.* ¶ 17.) The IF alleges Defendants used the names AEU Holdings and AEU Benefits interchangeably, so it uses the term "AEU" to refer to the two entities collectively. (*Id.* ¶ 15.) Where appropriate,[5] the court does so as well.

On April 26, 2016, AEU acquired the AISM program platform via an asset purchase agreement. (*Id.* ¶ 18.) At that time, AEU "took over the sales, marketing, underwriting, rating, claims handling, and program administration and advisory functions." (*Id.*) AEU continued in that role until this court issued a temporary restraining order appointing the IF on November 3, 2017. (*Id.* ¶¶ 10, 11.)

---

[5] The IF's use of the term "AEU" to refer to AEU Holdings and AEU Benefits collectively is problematic. The Seventh Circuit has stated that "where corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other" for purposes of personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund* v. *Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). An exception to this rule exists where the subsidiary is acting as the parent's agent. *IDS Life Ins. Co.* v. *SunAmerica Life Ins. Co.*, 136 F.3d 537, 541 (7th Cir. 1998). While the IF alleges that Defendants use the names AEU Holdings and AEU Benefits interchangeably (dkt. 8 ¶ 15), it does not allege that corporate formalities were not observed, that AEU Holdings dominated AEU Benefits, or that AEU Benefits was acting as AEU Holdings' agent.

Similarly, for purposes of determining liability, a parent company generally is not liable for the unlawful acts of its wholly-owned subsidiary unless it is appropriate to pierce the subsidiary's corporate veil. *See Shuffle Tech Int'l, LLC* v. *Sci. Games Corp.*, No. 15 C 3702, 2015 WL 5934834, at *5 (N.D. Ill. Oct. 12, 2015). Here, AEU Benefits is not a defendant (although it is a defendant in the DOL action), so it is unclear to the court whether there is any basis for the IF to recover from AEU Holdings for any unlawful acts that may have been committed by AEU Benefits, even under a veil-piercing theory.

Nevertheless, for purposes of deciding the present motion, the court must draw all reasonable inferences in favor of the IF. The court thus reads the term "AEU" in the complaint to refer only to AEU Holdings where doing so assists the IF's claims. In adopting this approach, the court notes that Defendants have not specifically argued that AEU Benefits' actions may not be attributed to AEU Holdings for purposes of personal jurisdiction or liability.

Defendant Stephen Satler was the CEO of AEU Holdings and a member of its Board of Managers. (*Id.* ¶ 3.) Satler owned approximately 22% of AEU Holdings. (*Id.*) Defendant Steven Goldberg was the COO of AEU Holdings and a member of its Board of Managers. (*Id.* ¶ 4.) Goldberg also owned approximately 22% of AEU Holdings. (*Id.*) Defendant Billie Wray was General Counsel of AEU Holdings from approximately June 2015 through July 1, 2017. (*Id.* ¶¶ 5, 37.)

AEU Holdings engaged entities called "aggregators" to solicit employers to form employee benefits plans that would participate in the AEU Plan.[6] (*Id.* ¶ 20.) Each employer's plan was to be established as a voluntary employees' beneficiary association ("VEBA") trust, an entity exempt from federal income tax under Internal Revenue Code section 501(c)(9). (*Id.* ¶ 23.)

AEU Holdings controlled the marketing materials that aggregators provided to solicited employers. (*Id.* ¶ 28.) For example, AEU Holdings authored a "VEBA Tool Kit Presentation" to describe how contributions would be collected from employers, how claims would be paid, and the benefits of self-funded plans versus fully-insured plans. (*Id.* ¶ 29.) AEU Holdings marketed its program as including "stop loss" insurance—designed to cover claims that exceeded the contributions made to the plan—that would be purchased by a single Bermuda purchasing trust ("BPT") as named insured, with all Participating Plans being co-beneficiaries of the trust. (*Id.* ¶¶ 29, 31.)

Black Wolf Consulting, Inc. was the main aggregator for the AEU Program. (*Id.* ¶ 97.) During 2016 and 2017, Black Wolf enrolled more than 75 percent of the Participating Plans that enrolled in the AEU Program. (*Id.* ¶¶ 20, 97; Dkt. 34 ¶ 7.) Black Wolf operated out of Frankfort,

---

[6] Neither party has put into the record a written agreement—if any exists—setting forth the terms of an aggregator's engagement.

Illinois, and approximately 39 percent of the Participating Plans Black Wolf enrolled were organized in Illinois, as of April 2017. (Dkt. 8 ¶¶ 97, 98.)

Defendants provided five documents to each employer that they knew "were required to be completed, executed, and/or received by each Participating Plan": (1) a VEBA trust agreement; (2) a program advisory services agreement; (3) a collection agreement with an aggregator; (4) a certificate from a BPT; and (5) a plan administrator services agreement. (*Id.* ¶ 25.)

Of particular note, the VEBA trust agreements for each Participating Plan required each plan's contributions to be placed in separate deposit accounts, or at least to be accounted for separately. (*Id.* ¶¶ 32, 58.) The VEBA trust agreements also provided that the trustee for each VEBA trust, "or the Plan Administrator as designee,"[7] was "specifically authorized to determine the required amount of contributions to pay the expected cost of benefit provided . . . " (*Id.* ¶ 32.) Defendants were not parties to any VEBA trust agreement, but they "owed duties" to Participating Plans to ensure that the requirements of the VEBA trust agreements were followed. (*Id.* ¶ 33.)

Defendants caused, approved, or tolerated multiple failings in the implementation of the Program that ultimately led to there being insufficient funds to pay all claims. First, Defendants "negligently failed to ensure the proper set up of the AEU Program." (*Id.* at p. 10.) Specifically, "almost none" of the Participating Plans set up separate bank accounts, obtained certificates of coverage from the BPT, or obtained approvals of their VEBA trusts from the IRS. (*Id.* ¶¶ 43-46.)

---

[7] Beginning in approximately December 2016, the Plan Administrator was a company named S.D. Trust Advisors. (Dkt. 34 ¶ 8; *see also* DOL Complaint ¶¶ 84-87.) Prior to that, the Plan Administrator was a company named Wilson Benefit. (DOL Complaint ¶¶ 84-87.)

Second, Defendants "were negligent in allowing/not prohibiting the improper commingling of the Participating Plans' funds." (*Id.* at p. 15.) Defendants knew, at least as of April 2017, that aggregators were putting contributions they received from employers into the aggregators' own bank accounts rather than a bank account for the corresponding plan and/or VEBA trust. (*Id.* at ¶¶ 61, 64.) Aggregators then took a portion of the employers' contributions to pay themselves and brokers working for them before forwarding the remaining balance to "the AEU Program's designated administrative representative's bank account."[8] (*Id.* at ¶ 61.) The administrative representative then withdrew fees for itself, AEU, and third-party administrators. (*Id.* at ¶ 62.) The remaining funds were "pooled in the Bermuda accounts." (*Id.* at ¶ 62.)

Third, and related to the above, Defendants "negligently allowed aggregators to deduct their fees from Participating Plan contributions." (*Id.* at 17.) In this regard, Defendants knew that all contributions from each employer were required (seemingly under the VEBA trust agreements, although the complaint does not make that clear) to go into the Participating Plans' accounts. (*Id.* ¶¶ 32, 62.)

Fourth, Defendants "negligently allowed associations and one-person groups to be Participating Plans." (*Id.* at p. 18.) "Covering single individuals is risky, and the AEU Program was rated and underwritten for group, rather than individual coverage." (*Id.* at ¶ 74.) Permitting single individuals contravened underwriting guidelines that Defendants themselves had adopted, which required each Participating Plan to have at least five full-time employees enrolled. (*Id.* at ¶¶ 30, 74.)

Fifth, Defendants "negligently allowed the AEU Program to be marketed improperly." (*Id.* at 20.) In this regard, Defendants told Participating Plans that "the employer's monthly

---

[8] By "the AEU Program's designated administrative representative," the IF appears to mean the Plan Administrator, S.D. Trust Advisors. (*See* Dkt. 34 ¶ 8.)

contribution/premium payment was the maximum cost to a Participating Plan and its employees." (*Id.* ¶¶ 81, 82.) This marketing was "improper" because the Participating Plans were to be self-funded plans, in which an employer "is responsible for all claims incurred in excess of the employer/employee contributions and stop-loss payments." (*Id.* ¶ 81.) In essence, the IF alleges that Defendants allowed the AEU Program to be marketed as a fully-insured plan that would pay all covered claims in exchange for the payment of monthly premiums. (*Id.*)

Sixth, Defendants "negligently failed to ensure that the plans in the AEU Program were properly underwritten." (*Id.* at 22.) "[A]s operated by Defendants, the AEU Program was to charge sufficient premiums from Participating Plans and to pool those premium contributions in order that the total would be sufficient to cover all medical claims for all Participating Plans." (*Id.* at ¶ 86.) Defendants did not charge sufficient premiums for multiple reasons, including that "[c]ompanies were underwritten as a group and then additional employees were accepted regardless of health status," and that Defendants allowed numerous one-person "groups" in the program. (*Id.* ¶¶ 85-87.)

The facts as set out above comprise a single negligence claim against all Defendants.. Defendants have moved to dismiss on grounds of lack of personal jurisdiction, improper venue, claim splitting, and failure to state a claim upon which relief can be granted. (Dkt. 19.) AEU Holdings and the individual defendants have submitted separate memoranda in support of the motion. (Dkts. 20, 21.) The IF submitted a response that included a declaration from Robert Moore, Jr., the President of Receivership Management, Inc. (Dkts. 33-35.) Defendants have moved to strike parts of the declaration. (Dkt. 41.)

**ANALYSIS**

## I.      Personal Jurisdiction

Because this is a diversity case personal jurisdiction is governed by the law of the forum

state. *Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); Fed. R. Civ. P. 4(k)(1)(A). The

Illinois long-arm statute permits the exercise of jurisdiction to the maximum extent permitted by

the United States Constitution. *Ariel Investments, LLC* v. *Ariel Capital Advisors LLC*, 881 F.3d

520, 521 (7th Cir. 2018); 735 Ill. Comp. Stat. 5/2-209(c).[9] The Constitution, in turn, permits a

defendant to be subject to either general or specific jurisdiction. *Bristol-Myers Squibb Co.* v.

*Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1779–80, 198 L. Ed. 2d 395

(2017). The IF does not argue that any of the Defendants is subject to general jurisdiction in

Illinois. (Dkt. 33 at 10.)

Specific jurisdiction lies where (1) a defendant has purposefully directed his activities at

the forum state or purposefully availed himself of the privilege of conducting business in that

state, and (2) the alleged injury arises out of the defendant's forum-related activities. *Tamburo*,

601 F.3d at 702. The exercise of specific jurisdiction also must "comport with traditional notions

of fair play and substantial justice." *Id.* In determining whether specific jurisdiction lies, a court

must consider "the interests of the forum State and of the plaintiff in proceeding with the cause

in the plaintiff's forum of choice, [b]ut the primary concern is the burden on the defendant."

*Bristol-Myers Squibb*, 137 S. Ct. at 1780. The fact that a defendant's out-of-state acts foreseeably

caused harm to a plaintiff in the forum state is not sufficient, by itself, to subject the defendant to

---

[9] Defendants argue, incorrectly, that "only Subsection (a)(2) of the Illinois long-arm statute," which provides for jurisdiction over defendants who have committed a tortious act within the State, could apply." (Dkt. 21 at 7.) That argument overlooks Subsection (c).

personal jurisdiction. *Walden* v. *Fiore*, 571 U.S. 277, 291, 134 S. Ct. 1115, 1126 (2014); *Ariel Investments*, 881 F.3d at 522.

A complaint need not allege facts that would establish personal jurisdiction, but a plaintiff faced with a Rule 12(b)(2) motion bears the burden of demonstrating jurisdiction at every stage following that challenge. *Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If a defendant makes evidentiary submissions on a Rule 12(b)(2) motion that put material facts in dispute, those disputes ultimately must be resolved at a hearing at which the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence; if no material facts are in dispute, the court may allow the litigation to proceed where the plaintiff makes a *prima facie* showing of jurisdiction. *Hyatt Int'l Corp.* v. *Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In deciding a Rule 12(b)(2) motion prior to an evidentiary hearing, all factual disputes supported by evidence submitted by the plaintiff must be resolved in the plaintiff's favor, as must any disputes for which defendants do not offer evidentiary support. *Purdue Research,* 338 F.3d at 782*; ABN AMRO, Inc.* v. *Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 823 (N.D. Ill. 2008). The court draws all reasonable inferences consistent with the complaint in the plaintiff's favor. *ABN AMRO*, 595 F. Supp. 2d at 818.

### A. Defendants' Motion to Strike Certain Allegations in the Moore Declaration

Both the IF and defendants have submitted declarations and exhibits in support of their positions on personal jurisdiction. Defendants move to strike certain allegations in the declaration of Robert Moore, Jr., the President of the IF. (Dkt. 34, the "Moore Declaration.") Defendants argue that the allegations lack a proper foundation, are made without personal knowledge, contain hearsay, and/or are statements of opinion rather than statements of fact. (Dkt. 41 at 2.) With respect to the foundation and hearsay objections, Defendants particularly argue

that Moore purports to rely on a review he and his counsel conducted of "hundreds of thousands of pages of documents" he obtained from AEU and Black Wolf. Moore attaches a selection of the documents to his declaration but does not include citations that indicate which documents support which statements, nor, Defendants argue, does he recite a foundation for the documents' admission into evidence. (*Id.* at 2–3; dkt. 49 at 2–3.) The IF responds that the Moore Declaration does lay a foundation for all statements therein in that Moore attests he has "personal knowledge" gained from his investigation and that the documents on which he relies are non-hearsay business records obtained from AEU and Black Wolf.[10] (Dkt. 47 at 5-6.)

The specific statements that Defendants move to strike in the Moore Declaration are the following:

- The IF's investigation related to the AEU Plan and Participating Plans has included obtaining requested documents from AEU Holdings, LLC ("AEUH"), AEU Benefits, LLC ("AEUB"), and Black Wolf Consulting, Inc. ("BWC"). The IF and its counsel have reviewed hundreds of thousands of pages of documents produced by those entities. Certain of those documents are produced with this Declaration as Exhibit B. An index of the documents prepared by counsel is attached as Exhibit A. The factual statements in this Declaration are based on all of the documents reviewed and not just the documents attached hereto. The documents attached hereto are representative of the documents produced to the IF and show that the facts set forth herein and in Plaintiff's Opposition are supported by documents produced to the IF. (Dkt. 34 ¶ 4.)

- With Defendants' supervision and approval, BWC received and controlled millions of dollars of contributions from Participating Plans into its bank account at the Bank of Pontiac in Monee, Illinois, deducted its fees, and then sent the remaining contributions to the AEU Program's designated Plan Administrator, S.D. Trust Advisors. S.D. Trust Advisors received those contributions originating from Participating Plans (including those in Illinois) into its account at Iberia Bank and then distributed those funds as directed by Defendants Stephen Satler ("Satler") and Steven Goldberg ("Goldberg") including payment of fees to AEU from that bank

---

[10] The IF also submitted, with its brief responding to the motion to strike, a second declaration from Moore attaching over 100 pages of additional documents obtained in the course of his investigation. (Dkt. 48.) The declaration does not contain citations to the documents or even an index, as the first Moore declaration does. Because the court finds a *prima facie* showing of jurisdiction has been made based on the first Moore declaration, it does not address the second Moore declaration or the documents attached to it.

account. Satler and Goldberg controlled the disbursement of such funds on a monthly—and sometimes even more frequent—basis. (*Id.* ¶ 8.)

- The attached documents show that Satler, Goldberg, and Defendant Billie Kathryn Wheeler Wray ("Wray") had numerous contacts, electronic and otherwise, with Illinois entities and persons soliciting and discussing business related to the AEU Plan. The documents show that the Defendants repeatedly and intentionally directed emails to persons in Illinois with the knowledge that effects would be felt in Illinois. The primary Illinois contacts of Satler, Goldberg, and Wray were Rod and Anna Maynor of BWC, with whom Satler, Goldberg, and Wray had numerous contacts related to the AEU Plan. Wray sent and received numerous emails with Rod and Anna Maynor at BWC in Illinois, had numerous phone calls with them, and sent documents to them, all related to the operation of the AEU Program. In addition, Defendants sent numerous inaccurate and misleading communications to AEU Program brokers and Participating Plans in Illinois. The email domain name for Satler, Goldberg, and Wray was "aeuholdings.com." (*Id.* ¶ 9.)

- The documents attached hereto also show that Defendants AEUH, Satler, Goldberg, and Wray provided advisory and administrative services and managed the AEU Program and in doing so, owed duties to the AEU Plan and Participating Plans to provide accurate information and manage the AEU Program properly. (*Id.* ¶ 10.)

(Dkt. 34 at ¶¶ 4, 8-10.)

As an initial matter, the court need only address the admissibility of these statements to the extent they are controverted by evidence submitted by Defendants. As set forth above, a court considering whether a plaintiff has made a *prima facie* showing of personal jurisdiction must credit any allegations in a plaintiff's complaint that the defendant's evidence does not controvert. *ABN AMRO*, 595 F. Supp. 2d at 818.

Each of the individual defendants (Satler, Goldberg, and Wray) submitted declarations with their motion to dismiss that address their contacts, or lack thereof, with Illinois. (Dkts. 20-9, 20-10, 20-11.) Those declarations do not controvert the assertions in the Moore Declaration.[11]

---

[11] The court highlights four statements in those declarations to illustrate this point. First, the declarations deny ever entering a contract to "personally perform [or receive] professional services of any kind in Illinois." (Dkt. 20-9 ¶¶ 12-13; Dkt. 20-10 ¶¶ 11-12; Dkt. 20-11 ¶¶ 11-12.) Second, the declarations deny ever having "initiated contact with an Illinois entity soliciting business related to 'AEU' as that term

Satler submitted a second declaration that arguably does controvert two of the relevant assertions in the Moore Declaration: (1) that Black Wolf deducted its fees from the Participating Plans "[w]ith Defendants' supervision and approval" and (2) that "Satler and Goldberg controlled the disbursement" of funds by the Plan Administrator, S.D. Trust Advisors. (Dkt. 20-12; Dkt. 34 ¶ 8.) In contrast to those assertions, Satler attests: "Neither I, Mr. Goldberg, nor 'AEU' as that term has been used by [the IF] in this case, ever received, had possession of, or controlled the disbursement of any premium funds purportedly sent by an Illinois based entity associated with what [the IF] has called the 'AEU Plan'…" (Dkt. 20-12 ¶ 29.) Satler also attests, "Neither I, Mr. Goldberg, Ms. Wray nor any AEU entity ever collected plan contributions, paid any fees to service providers, or otherwise participated in the transfer of funds that originated from employers' plan contributions." (*Id.* ¶ 30.) Thus, the court must consider whether it should credit the statements in the Moore Declaration regarding Defendants' involvement in and control over the way Participating Plans' contributions were handled.

Defendants contend that the statements are not admissible under the Federal Rules of Evidence as is required for a Rule (12)(b)(3) motion. The IF points to cases where a receiver or trustee in bankruptcy has been allowed to testify about the financial situation of the estate under its control and its investigative findings related to that estate. (Dkt. 47 at 9.) *Warfield* v. *Byron*, 436 F.3d 551, 559 (5th Cir. 2006); *BDO Seidman, LLP* v. *Banco Espirito Santa Int'l*, 38 So. 3d 874, 880 (Fla. App. 2010) (a "receiver or trustee may testify from personal knowledge regarding relevant aspects of his or her own personal investigation of the business failure and liquidation or

---

has been used by RMI in this case." (Dkts. 20-9 ¶ 14; 20-10 ¶ 13; 20-11 ¶ 13.) Third, Satler's declaration attests that AEU Holdings and AEU Benefits "do[] not advertise in Illinois or engage in any general advertising targeted towards Illinois. (Dkt. 20-12 ¶ 18-19.) Fourth, Wray's declaration denies ever having "provided legal advice to an individual or entity located in Illinois related to 'AEU' as that term has been used by RMI in this case." (Dkt. 20-11 ¶ 14.)

reorganization of the entity"); *see also Sec. & Exch. Comm'n* v. *Total Wealth Mgmt., Inc.*, No. 15-CV-226, 2018 WL 3456007, at *3 (S.D. Cal. July 18, 2018) (concluding that court-appointed receiver had personal knowledge to support his conclusion that defendant misappropriated nearly $2 million based on his "investigation and analysis of the business and financial activities of the Receivership Entities"); *Dietz* v. *Spangenberg*, No. CIV. 11-2600, 2014 WL 537753, at *3 (D. Minn. Feb. 11, 2014) (permitting bankruptcy trustee to testify to "the circumstances he observed while fulfilling his statutory duty to investigate the financial affairs of [the debtor]… as well as to the results of his investigation"). Moore can so testify here for purposes of establishing a *prima facie* case of personal jurisdiction.

Defendants also object to Moore's reliance on the documents attached to his declaration on the grounds that he fails to make clear what assertions they support and does not authenticate them or establish their admissibility. (Dkt. 41 at 4-5.) Although not ideal, Moore provides an index to the documents that provides guidance as to what he takes the documents to mean. (Dkt. 34-1.) Moore's representation that all documents were produced by parties to these related case is sufficient authentication at this stage. *See Reid* v. *Wal-Mart Stores, Inc.*, 274 F. Supp. 3d 817, 821 (N.D. Ill. 2017) (holding that the fact that documents were produced by a defendant was sufficient authentication at summary judgment stage). Defendants do not dispute that the documents were produced by one or more of the Defendants and presumably could not, since most of the documents are emails that on their face suggest they were sent or received by one or more of the individual defendants. *See id.* (holding that court would rely on documents at summary judgment stage where there was a reasonable basis to believe they would be admissible).

Some of the documents—construed in the light most favorable to the IF—support Moore's assertion that Satler and Goldberg issued directions to the Plan Administrator, S.D. Trust Advisors, regarding the distribution of contributions from Participating Plans. (*See* Dkt. 34-2 at 116 (June 2017 email from Goldberg to Thomas Stoughton of S.D. Trust Advisors asking him to "[p]lease initiate distribution to all parties today" of certain "money received from Black Wolf Consulting for May"); *id.* at 146 (August 2017 email from Goldberg to Stoughton "advis[ing]" him to wire $82,078.11 because "Black Wolf Consulting mistakenly included these premiums in the $2,000,000 wired to you"); *id.* at 153 (August 2017 email from Goldberg to Stoughton saying, "You will be distributing $759,512.03 for BPT2…").) In addition, the IF's complaint references a June 2017 email from Wray to a Black Wolf employee in which she states that "technically" all the contributions Black Wolf collected should be placed in separate accounts for the VEBA trusts, and, "All the money collected (yes All), should be deposited in the trust."[12] (Dkt. 8 ¶ 66.) This email arguably suggests that Wray was aware that Black Wolf had not been depositing all plan contributions in designated trust accounts but had been deducting fees from them.

Thus, the court will credit—at this early stage in the litigation—the statements in the Moore Declaration relating to Satler and Goldberg's alleged control over the distribution of funds by S.D. Trust Advisors and Defendants' knowledge that Black Wolf was deducting its fees from Participating Plans' contributions. On the other hand, the court disregards Moore's assertions of legal conclusions, for example, that "Defendants… owed duties to the AEU Plan and Participating Plans to provide accurate information and manage the AEU Program properly,"

---

[12] To the extent Defendants argue that these documents are barred by the hearsay rule, they are not correct. The documents are not hearsay because they do not go to show the truth of any matter asserted but are, rather, instructions or orders which are "not capable of being true or false." *Sec. & Exch. Comm'n* v. *Berrettini*, No. 10-cv-1614, 2015 WL 5159746, at *9 (N.D. Ill. Sept. 1, 2015)

and "Defendants sent numerous inaccurate and misleading communications to AEU Program brokers and Participating Plans in Illinois." (Dkt. 34 ¶¶ 9, 10.)

**A.      Purposeful Availment**

The evidentiary disputes thus settled, the first question in the specific jurisdiction analysis is whether Defendants purposefully availed themselves of the privilege of conducting business in Illinois or purposefully directed their activities towards Illinois. *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174 (1985). The IF argues that Defendants' purposeful jurisdictional contacts come both from their use of a sales agent, Black Wolf, that operated in Illinois and solicited Illinois entities and from Defendants' own direct contacts with Illinois.

**i.      Whether Black Wolf's Jurisdictional Contacts Are Attributable to Defendants**

The Supreme Court has stated that "when commercial activities are carried on in behalf of an out-of-state party those activities may sometimes be ascribed to the party, at least where he is a primary participant in the enterprise and has acted purposefully in directing those activities." *Burger King*, 471 U.S. at 480 n. 22 (internal citation and punctuation omitted). Accordingly, this court has held that "the forum-related activities of an agent and a subagent are imputable to the principal and are counted as the principal's contacts for jurisdictional purposes." *ABN AMRO, Inc.* v. *Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008). Similarly, this court has held that the jurisdictional contacts of joint venturers or partners also may be attributed to a defendant "even in the absence of a formal agreement" establishing such a relationship. *Wendt* v. *Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1030 (N.D. Ill. 2009).

The parties address the question of whether Black Wolf's jurisdictional contacts are attributable to Defendants through the framework of agency. (Dkt. 33 at 3; dkt. 44 at 11–12.) For an agency relationship to exist, the alleged agent must have "either actual or apparent authority,

or the principal must ratify the agent's unauthorized actions." *ABN AMRO*, 595 F. Supp. 2d at 821. Defendants argue that there are no allegations in the complaint related to Black Wolf's actual or apparent authority or Defendants' ratification of Black Wolf's actions. (Dkt. 44 at 12.) Defendants also object to the IF's assertion that AEU Holdings "chose" Black Wolf, pointing out that, according to allegations in the related cases, it was a company called Veritas, not AEU Holdings, that first engaged Black Wolf to participate in the Program. (*See* Dkt. 33 at 4; Dkt. 44 at 3, 12.)

While the agency framework is helpful to this analysis, the question of whether an agency relationship exists is not precisely the same question as whether Black Wolf's contacts are attributable to Defendants. "Even if Defendants' relationship were to fall slightly outside the confines of [the agency doctrine]," the relevant question is whether "a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction."[13] *Daynard* v. *Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 56–57 (1st Cir. 2002); *see also Daimler AG* v. *Bauman*, 571 U.S. 117, 135 n.13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents *or distributors* to take action there") (emphasis added). With this principle in mind, the court finds the following allegations, taken as true, show a relationship sufficient to impute Black Wolf's solicitations of Illinois entities and allegedly wrongful withdrawal of funds to each defendant.

---

[13] The court is aware of one unpublished Seventh Circuit opinion in which it stated that the legal definition of agent is the same both for purposes of determining personal jurisdiction and determining liability. *Unity House, Inc.* v. *First Commercial Fin. Grp., Inc.*, 175 F.3d 1022, 1999 WL 164924, at *2 (7th Cir. 1999) (unpublished). That issue was not contested in the appeal. *Id.* Given that that disposition is non-precedential, the issue was not squarely before the court, and the Supreme Court's opinion in *Daimler* quoted above suggests that an agency relationship is not necessary to impute a third-party's contacts to a defendant, the court finds the First Circuit's reasoning in *Daynard* more persuasive.

First, the complaint alleges that Black Wolf was responsible for "recruit[ing] and enroll[ing]" a large number of Illinois employers to form Participating Plans. (Dkt. 8 ¶¶ 20, 96–98; *see also* dkt. 34 ¶ 7.) The IF alleges Black Wolf enrolled over 75 percent of the Participating Plans that participated in the AEU Plan in 2016 and 2017. (Dkt. 8 ¶¶ 20, 97; Dkt. 34 ¶ 7.) Black Wolf operated out of Illinois and approximately 39 percent of the Participating Plans Black Wolf enrolled were organized in Illinois. (Dkt. 8 ¶¶ 97, 98.) There were more Participating Plans organized in Illinois, and more Illinois residents enrolled in those plans, than there were from any other state. (Dkt. 8 ¶ 96; Dkt. 20 at 11.) The IF alleges that each of the Defendants was closely involved in Black Wolf's solicitations, communicating with Black Wolf frequently, controlling the marketing materials Black Wolf used, and sending documents to Black Wolf for execution by the Participating Plans.[14] (Dkt. 8 ¶¶ 20, 45, 92, 99, 100, 102, 105.) While the IF does not expressly allege that Defendants directed Black Wolf to solicit Illinois employers and residents, that is a reasonable inference to draw given that Illinois was the AEU program's biggest market. Similarly, the IF argues that Defendants ratified Black Wolf's solicitations by "accept[ing] employer groups into the program." (Dkt. 33 at 4.) Although there is no express allegation in the complaint that Defendants had the power to accept or reject employer groups solicited by Black Wolf, it is a reasonable inference to draw based on the control Defendants allegedly exerted over the program.

Second, as discussed above, the Moore Declaration avers that Defendants "supervis[ed] and approv[ed]" of Black Wolf's withdrawal of fees from contributions made by the Participating Plans, and that Satler and Goldberg ultimately directed the payment of fees to AEU

---

[14] Specifically in this regard, the complaint alleges that Wray set up the onboarding process for new employers to follow to establish a VEBA trust that could participate in the program. (Dkt. 8 ¶ 45.)

from those contributions.[15] (Dkt. 34 ¶ 8.) The withdrawal of "excessive fees" from employer

contributions is one of the principal allegations of negligence in the complaint. (Dkt. 8 ¶¶ 65,

118.)

These allegations are sufficient to make a *prima facie* showing that Black Wolf's

solicitations of Illinois employers and withdrawal of funds from Participating Plan contributions

should for jurisdictional purposes be attributed to Defendants. Multiple decisions of this court

have reached the same conclusion based on similar facts.[16] In *ABN AMRO*, for example, a

plaintiff investor sued a defendant under the securities laws for omitting material information in

offering documents the plaintiff alleged it received from the defendant's sales agents. 595 F.

Supp. 2d at 816. The court held that the plaintiff made a *prima facie* showing of agency based on

evidence that the defendant knew its putative agents "were soliciting U.S. purchasers" and had

"condoned such solicitation." *Id.* at 824. Similarly, in *Bentel & Co., LLC* v. *Schraubenwerk*

*Zerbst GmbH*, the court found that a putative agent "acted with actual authority for his Illinois

contacts to inure to [the defendant] when, for example, he made initial overtures to [an Illinois

---

[15] Multiple allegations in the complaint and the Moore Declaration refer to "Defendants" as an undifferentiated group. Such so-called "group pleading" is permissible if it "provides enough detail about the nature of the allegations to put each defendant on fair notice of the claims." *Sanders* v. *JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016). Assertions that all members of a group committed a certain act also must be plausible. *Chamberlain Grp., Inc.* v. *Techtronic Indus. N. Am., Inc.*, No. 16 CV 06113, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017) (holding group pleading as to corporate defendants to be implausible where plaintiff failed to show "why it can be plausibly inferred that information known to one was known to all"). The court concludes that the group allegations discussed in this section all plausibly allege acts related to all Defendants.

[16] The court also finds persuasive the Illinois Appellate Court's ruling that a third-party's contacts with a plaintiff in Illinois could be attributed to defendants where defendants had "entered into an agreement with [the third party] to jointly promote 'investment strategies'" and had engaged the third party to "act as a recommender and endorser of [one of the defendants]." *Khan* v. *Gramercy Advisors, LLC*, 61 N.E.3d 107, 142, 2016 IL App (4th) 150435, ¶ 179-82. That opinion relied on the principle articulated by the Illinois Supreme Court that "[b]y engaging a business entity located in Illinois, defendant undoubtedly benefitted from Illinois' system of laws, infrastructure, and business climate." *Russell* v. *SNFA*, 987 N.E.2d 778, 796, 2013 IL 113909, ¶ 81, 987 N.E.2d 778, 796 (Ill. 2013).

company] about doing business with [the defendant] and drove to Chicago at least eight times to meet with [the Illinois company's] personnel regarding its relationship with [the defendant]." No. 16-cv-11479, 2017 WL 3278324, at *6 (N.D. Ill. Aug. 2, 2017). The court in *Bentel* further found that the defendant "ratified the benefits of [the putative agent's] efforts when it entered into and maintained a business relationship with [the Illinois company]." *Id.* This court also has held that actions of a third party may be attributable to an individual corporate officer for personal jurisdiction purposes. *Greene* v. *Karpeles*, No. 14 C 1437, 2019 WL 1125796, at *8 (N.D. Ill. Mar. 12, 2019) ("Although [defendant] did not himself make the alleged misrepresentations to [plaintiffs], it is enough that he (allegedly) directed his agents to do so").

In contrast, this court has held that third-party solicitations are not attributable to a defendant where such solicitations are "made by an independent contractor that exercises a high degree of control over the conduct of a nationally-directed campaign," such that defendants "made no purposeful or knowing effort to reach Illinois residents in particular." *Orgone Capital III, LLC* v. *Daubenspeck*, No. 16 C 10849, 2017 WL 3087730, at *6 (N.D. Ill. July 20, 2017). That case is readily distinguishable based on the allegations of Defendants' control over Black Wolf's solicitations and the fact that Illinois was the AEU Program's biggest market. Defendants cite no case in which a third-party's solicitations of the sort the IF alleges Black Wolf engaged in were not imputed to the principal for purposes of personal jurisdiction.

Defendants correctly point out that there are no allegations in the complaint or the Moore Declaration that Black Wolf had the "power to bind AEUH," (dkt. 44 at 12). The IF has sufficiently alleged, however, that Defendants approved Black Wolf's solicitations and ratified those solicitations by accepting Participating Plans into the AEU program. (Dkt. 33 at 12.) Finally, Defendants' argument that "Veritas, not the Defendants, solicited [Black Wolf] to

participate in the 'Program'" is unavailing.[17] (Dkt. 44 at 12.) The jurisdictional contacts of a corporate predecessor are imputed to its successor in interest. *Purdue Research*, 338 F.3d at 784. Here, the jurisdictional contacts of AISM are imputed to AEU Holdings, since AEU Holdings acquired all of AISM's assets, and AISM hired Veritas. (Dkt. 8 ¶ 18; Dkt. 21 at 8 (citing DOL Complaint ¶¶ 44, 50).) Moreover, that Defendants did not initiate contact with Black Wolf is not relevant given that Defendants do not dispute they knew Black Wolf was operating from Illinois and soliciting Illinois entities on their behalf at the time of the acquisition in April 2016.

Defendants' contacts with Illinois through Black Wolf are, by themselves, sufficient minimum contacts to show purposeful availment. Marketing a product in a forum state is a paradigmatic example of purposeful availment. *Orgone Capital*, 2017 WL 3087730, at *6 ("This court agrees that if [defendants] had directly marketed investment products to Illinois residents, there would be little question of this court's jurisdiction"); *ABN AMRO,* 595 F. Supp. 2d at 824 (finding *prima facie* showing of jurisdiction based on defendant's knowledge that its agents "were soliciting U.S. entities to enter into the deal"); *Daimler*, 571 U.S. at 128 n. 7 ("specific jurisdiction may lie over a foreign defendant that places a product into the 'stream of commerce' while also . . . marketing the product through a distributor who has agreed to serve as the sales agent in the forum State").

ii.     **Defendants' Direct Contacts with Illinois**

In addition to the contacts imputed to Defendants by virtue of their relationship with Black Wolf, each Defendant had direct contacts with Illinois as well. First, both Satler and Goldberg traveled to Illinois on AEU business. Satler attests that he traveled to Illinois on behalf

---

[17] In support of this argument, Defendants' declarations attest that they never "*initiated* contact with an Illinois entity soliciting business related to 'AEU.'" (*See, e.g.*, Dkt. 20-9 ¶ 9; dkt 20-10 ¶ 13; dkt. 20-11 ¶ 13 (emphasis added).)

of AEU Benefits three times over the course of 2016 and 2017. (Dkt. 20-9 ¶ 11.) Goldberg attests that he traveled to Illinois on behalf of AEU Holdings once or twice over the same time period. (Dkt. 20-10 ¶ 9.) Satler and Goldberg do not challenge the allegation in the IF's complaint that they met with Black Wolf on one of these trips. (Dkt. 8 ¶ 102.) (Wray also admits traveling to Illinois "once or twice in 2017" (Dkt. 20-11 ¶ 10), but there is no information in her affidavit as to whether the purpose of her travel was connected to AEU business, and the IF's complaint does not so allege.)

The visits to Illinois are significant. "[E]ven one visit can be a sufficient contact where the cause of action arises out of the same activity." *Orgone Capital*, 2017 WL 3087730, at *6. Moreover, the visit itself need not lead directly to the plaintiff's alleged injury "so long as the injury arises out of the same course of activity." *Id.* at *7. The IF does not state what actions Satler and Goldberg undertook during their visits to Illinois, but it is reasonable to infer that they talked about marketing in Illinois since they met with their main aggregator, Black Wolf.

Second, Defendants allegedly breached a duty of trust owed to Illinois entities and the harm from that breach was felt by Illinois entities. The heart of the IF's claim is that Defendants were the force behind the creation of a complicated insurance program and, while multiple entities bore responsibility for various aspects of that program, Defendants bore at least some responsibility for "the sales, marketing, underwriting, rating, claims handling, and program administration and advisory functions." (Dkt. 8 ¶ 18.) In short, this claim is that Defendants occupied a position of trust with respect to the AEU Plan and the Participating Plans and, as such owed them duties that it breached. That a defendant occupied a position of trust with respect to Illinois plaintiffs is significant to a jurisdictional analysis. *Greene,* 2019 WL 1125796, at *7 (noting that defendant "served in a position of trust that gave rise to ongoing obligations toward

[defendant's clients] and their property"). Here, as in *Greene*, Defendants purposefully entered into commercial relationships with a large number of Illinois entities and "served in a position of trust" with respect to those entities and their assets.

The harm felt from Defendants' alleged breaches of that trust was felt predominantly in Illinois, which had more Participating Plans and more residents enrolled in those plans than any other state. While the fact that harm was felt by Illinois residents is insufficient by itself to confer jurisdiction, *see Ariel Investments,* 881 F.3d at 522, it remains a relevant factor in assessing the purposiveness of Defendants' actions towards the forum. *Bristol-Myers Squibb*, 137 S. Ct. at 1782 (noting that plaintiffs did not claim to be injured in California); *uBID, Inc.* v. *GoDaddy Grp., Inc.*, 623 F.3d 421, 428 (7th Cir. 2010) ("[Defendant] cannot now point to its hundreds of thousands of customers in Illinois and tell us, 'It was all their idea'").

### B.    Whether the IF's Claim Arises From Defendants' Forum-Related Activities

The second step of the specific-jurisdiction analysis inquires into whether a plaintiff's claims "arise out of or relate to" defendant's forum-related contacts. *uBid*, 623 F.3d at 430. This test is met because Defendants' solicitations of Illinois entities through Black Wolf engendered the formation of the Participating Plans and the attendant duties allegedly owed to those plans by Defendants. *See Orgone Capital*, 2017 WL 3087730, at *6 ("This court agrees that if [defendants] had directly marketed investment products to Illinois residents, there would be little question of this court's jurisdiction"). In addition, one particular alleged breach of Defendant's duties—approving Black Wolf's alleged wrongful withdrawal of fees—is connected to Illinois since Black Wolf operated out of Illinois and allegedly deducted its fees from the Illinois bank account into which it deposited plan contributions. (Dkt. 34 ¶ 8.)

### C.    Traditional Notions of Fair Play and Substantial Justice

The final inquiry in the specific-jurisdiction analysis is whether the exercise of personal jurisdiction over an out-of-state defendant would offend traditional notions of fair play and substantial justice. The factors relevant to this inquiry are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal punctuation omitted). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.*

Defendants do not argue that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. Application of the factors above points to the conclusion that it would not. The IF's interest in convenient and effective relief is best served by the exercise of jurisdiction in the state with the most Participating Plans and most residents enrolled in such plans. The burden on Defendants is greater than it would be in their home states, but this factor is blunted by the fact that Defendants other than Wray are all defendants in the DOL action before this court and have not moved to dismiss those suits on personal jurisdiction grounds. The existence of related litigation in this court also makes this the most efficient forum in terms of the interstate judicial system's interests. Thus, the court concludes that the exercise of jurisdiction is consistent with traditional notions of fair play and substantial justice.

## II. Fiduciary Shield Doctrine

The individual defendants argue that each is protected from the exercise of jurisdiction by Illinois's "fiduciary shield" doctrine. (Dkt. 21 at 9-10; Dkt. 44 at 12-14.) The fiduciary shield doctrine "prevents courts from asserting jurisdiction over a person on the basis of acts taken by that person not on his own behalf, but on behalf of his employer." *Levin* v. *Posen Found.*, 62 F. Supp. 3d 733, 741 (N.D. Ill. 2014) (quoting *Rollins* v. *Ellwood,* 141 Ill.2d 244, 280, 565 N.E.2d 1302 (1990)). The rationale behind the doctrine is that it would be "unfair and unreasonable to assert personal jurisdiction over an individual who [sought] the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal." *Rollins*, 565 N.E.2d at 1318. The doctrine does not apply, however, where a defendant's actions were motivated by his or her personal interests or were within their discretion. *Levin*, 62 F. Supp. 3d at 741; *Orgone Capital*, 2017 WL 3087730, at *7. Application of the doctrine is within the discretion of the court; it is not an absolute right of a defendant. *Levin*, 62 F. Supp. 3d at 741.

Satler and Goldberg's argument that the fiduciary shield doctrine protects them merits little discussion. The Illinois Appellate Court has held that the fiduciary shield doctrine is "inapplicable to proprietors, partners, or comanaging members of a limited liability corporation." *Khan* v. *Gramercy Advisors, LLC*, 2016 IL App (4th) 150435, ¶ 85. That principle is dispositive here, since Satler and Goldberg were co-managing members of AEU Holdings. (Dkt. 20-12 ¶ 7.) The fact that Satler and Goldberg held executive roles and had 22% ownership stakes in the company reinforces the inapplicability of the doctrine. *See C.S.B. Commodities, Inc.* v. *Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 849 (N.D. Ill. 2009) (it "stands to reason that, as the President of the company, [defendant] had sufficient control over the company's marketing strategies to control whether to market [its product] anywhere in the United States, including in

Chicago"); *Consumer Benefit Svcs., Inc.* v. *Encore Marketing Int'l, Inc.*, No. 01-cv-6985, 2002 WL 31427021, at *4 (N.D. Ill. Oct. 30, 2002) (holding that fiduciary shield did not apply to COO who owned 32% of company's shares, or president who owned 20%).

The application of the fiduciary shield doctrine to Wray, however, is a closer question. The IF concedes that Wray had no ownership interest in AEU Holdings and does not argue that her forum-related activities were motivated by her personal interests. (*See* Dkt. 33 at 12.) Thus the issue turns on whether her actions were discretionary. The IF cites several emails that suggest Wray exercised a significant degree of discretion in her role as general counsel. First, the IF cites a May 2017 email Wray sent Satler and Goldberg on the issue of whether to accept contributions from Participating Plans that had not yet been "fully underwritten" and "fully documented," in which Wray wrote, "I do not believe we should not take money because paperwork is not done." (Dkt. 8 ¶ 55.) Second, the IF cites an August 2017 email in which Tom Stoughton of S.D. Trust Advisors, the plan administrator, wrote that Wray was "responsible for documentation" necessary to organize and enroll Participating Plans but that he was "not aware of ANY process by which documents are executed or how/when groups are added." (*Id.* ¶ 56.) Third, the IF cites an April 2017 email in which Wray allegedly preempted AEU Holdings CFO Steven Nigro's instruction that 105 of 300 new employer groups needed to be cancelled because they were one-person groups. (*Id.* ¶ 79.) The IF alleges that Wray wrote Satler and Goldberg that Nigro's "requests fall outside of his authority" as CFO and "who we cancel or write is absolutely outside of [Nigro's] role and responsibilities." (*Id.*)

The court agrees that these examples suggest Wray operated with sufficient discretion such that the fiduciary shield doctrine should not apply. *See Leong* v. *SAP Am., Inc.*, 901 F. Supp. 2d 1058, 1065 (N.D. Ill. 2012) (holding that fiduciary shield doctrine did not protect a

company's Chief Human Resources Officer who had control and discretion over an employment discrimination plaintiff's compensation and conditions of her employment); *Brujis* v. *Shaw*, 876 F. Supp. 975, 980 (N.D. Ill. 1995) (holding that fiduciary shield doctrine did not protect senior corporate officers because they "made a conscious decision to conduct business in Illinois through allegedly deceptive practices, and they must answer in Illinois for the consequences of that decision"). Wray cites *Jones* v. *Sabis Educational Systems, Inc.*, 52 F. Supp. 2d 868, 884 (N.D. Ill. 1999), where the court held that the fiduciary shield doctrine protected a general counsel who fired a plaintiff who later sued for wrongful termination. But that case is distinguishable because the general counsel there submitted an uncontroverted affidavit that he had fired the plaintiff "at the direction of" a superior. *Id.* Here, Wray has not submitted evidence indicating all of her forum-related activity was done at the direction of superiors.

The court's ruling is without prejudice, however. If, for example, discovery shows that Wray was acting entirely under the direction of other corporate officers and not exercising her own discretion in her interactions with Black Wolf and Participating Plans, she may once again move for dismissal on jurisdictional grounds. *See Leong*, 901 F. Supp. 2d at 1065.

## III.    Venue

Venue is proper in a district where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2); *Capgain Props. Inc.* v. *Landmaster Partners, LLC*, No. 15 C 9234, 2016 WL 3035534, at *3 (N.D. Ill. May 29, 2016). A "substantial part" is less than a majority, and venue is proper in a district with substantial ties to the claims even if more claim-related events took place in other districts. *Elorac, Inc.* v. *Sanofi-Aventis Canada Inc.*, No. 14-CV-1859, 2014 WL 7261279, at *13 (N.D. Ill. Dec. 19, 2014).

First, Black Wolf operated out of this district, in Monee and Frankfort, Illinois. (Dkt. 34 ¶¶ 7-8.) Thus, relevant solicitations and Black Wolf's allegedly wrongful withdrawal of fees occurred in this district. Second, at least 62 Participating Plans are located in this district, to which Defendants owed a duty of reasonable care. (Dkt. 8 ¶ 98; Dkt. 33 at 15.) Third, Satler and Goldberg traveled to this district to meet with Black Wolf and discuss the AEU Program. (Dkt. 8 ¶ 102.) These events are sufficient to establish this district's substantial ties to the events giving rise to IF's claim.

## IV.    Claim Splitting

Defendants next argue that the IF's claim should be dismissed under the rule against claim splitting because it should have been brought in the DOL action. (Dkt. 21 at 4-6; Dkt. 20 at 8.) "The prohibition against claim splitting is an application of the familiar doctrine of claim preclusion to two actions that are pending simultaneously and have not reached final judgment." *Trading Techs. Int'l, Inc.* v. *BCG Partners, Inc.*, No. 10-cv-715, 2011 WL 3157304, at *3 (N.D. Ill. July 26, 2011); *accord Rein* v. *David A. Noyes & Co.*, 665 N.E.2d 1199, 1203, 172 Ill. 2d 325, 340 (Ill. 1996). "Courts will dismiss a second suit pending between the same parties for claim splitting if the second suit would be barred by claim preclusion if it is assumed the first suit reached final judgment." *Trading Techs.,* 2011 WL 3157304, at *3.

Because the IF's suit brings only an Illinois cause of action, Illinois claim-preclusion principles apply. "In Illinois the defense of claim preclusion has three prerequisites: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of the causes of action; and (3) an identity of parties or their privies." *Walczak* v. *Chicago Bd. of Educ.*, 739 F.3d 1013, 1016 (7th Cir. 2014) (citing *Cooney* v. *Rossiter,* 986 N.E.2d 618, 621, 2012 IL 113227, ¶ 18 (Ill. 2012)).

Defendants argue that the instant action is barred because both it and the DOL action arise from a "common nucleus of operative facts" and that, while the DOL and the IF are not the same parties, they do not "significantly differ" because the IF "was appointed by the court . . . at the request of DOL, serves at the pleasure of DOL, and has the same interests as DOL." (Dkt. 21 at 5-6.) The IF responds that claim-splitting requires an identity of parties, or at least that there is a significant difference between the IF and the DOL. (Dkt. 33 at 17.) The IF asserts that it has "entirely different functions and obligations than the DOL" and does not serve at the pleasure of the DOL. (*Id.*)

In all of the cases cited by Defendants, the court applied the doctrine to parties that were actually identical. *Serlin* v. *Arthur Andersen & Co.*, 3 F.3d 221 (7th Cir. 1993) ("[I]t is clear that Serlin's two complaints involve the same parties and seek the same remedies"); *see also Shaver* v. *F.W. Woolworth Co.*, 840 F.2d 1361, 1365 (7th Cir.1988); *In re Energy Co-op., Inc.*, 814 F.2d 1226, 1230 (7th Cir. 1987). Even if the doctrine could be applied to substantially identical parties (Defendants cite no such case), there are significant differences between the IF—an administrator appointed by this court—and the Department of Labor. The court order in the DOL action appointing the IF as administrator is explicit that the IF is not subject to the DOL's control. *See Pizzella* v. *AEU Benefits, LLC*, No. 17-cv-7931, Dkt. 59, ¶ 16 (N.D. Ill. Dec. 13, 2017) (stating that "[t]he Independent Fiduciary shall not be discharged or terminated during the duration of this Order except upon order of the Court or by leave of Court").

V.     **Motion to Dismiss for Failure to State a Claim**

When considering a Rule 12(b)(6) motion, the court accepts all of the plaintiff's allegations as true and views them "in the light most favorable to the plaintiff." *Lavalais* v. *Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). A complaint must contain allegations that

"state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). The plaintiff does not need to plead particularized facts, but the allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007).

## A.     Choice of Law Analysis

As an initial matter, this court must determine what substantive law applies to the IF's claim. In diversity actions, a federal court looks to its forum state's choice-of-law rules to determine what substantive law to apply. *Tanner* v. *Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Illinois choice-of-law rules provide that tort claims are to be governed by the law of the jurisdiction with the "most significant relationship to the occurrence and the parties." *Id.* (citing *Esser* v. *McIntyre,* 661 N.E.2d 1138, 1141, 169 Ill. 2d 292 (Ill. 1996)). Under this test, "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.*

Defendants argue that District of Columbia law should apply because the IF's claim relates in part to the VEBA trust agreements, and those agreements contain a choice-of-law provision electing District of Columbia law. (Dkt. 20 at 11-12; Dkt. 33 at 20.) Defendants cite *HSBC Bank USA, NA* v. *Rejeki,* No. 12-cv-3915, 2014 WL 5310483, at * 3 n.5 (N.D. Ill. Oct. 17, 2014), which applied the choice-of-law provision in a trust agreement. *HSBC Bank*, however, involved a contract claim—specifically, whether HSBC Bank was entitled to foreclose on a home pursuant to a loan agreement. *See id.* Illinois choice-of-law rules with respect to contract claims are different: Courts "should give effect to a choice-of-law provision in a contract unless the contract chooses a foreign law that is dangerous, inconvenient, immoral, or contrary to the public policy of the local government." *Bank of America, N.A.* v. *Bassman FBT, L.L.C.*, 981 N.E.2d 1, 6, 2012 IL App (2d) 110729, ¶ 10 (Ill. App. Ct. 2012). Here, it is undisputed that

Defendants were not parties to the VEBA trust agreements. (Dkt. 8 at ¶ 33; Dkt. 20 at 11-12.)

Thus they cannot avail themselves of that agreement's choice-of-law provision. *Bank of America,* 981 N.E.2d at 5 (an "entity that is not a party to a contract cannot typically invoke a choice-of-law provision contained in the contract").

The court therefore looks to the tort-law principle that "the law of the place of injury" generally controls. Where an injury is purely economic, "the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Knaus* v. *Guidry*, 906 N.E.2d 644, 663, 389 Ill. App. 3d 804, 827 (Ill. App. Ct. 2009) (citing *Cantor Fitzgerald, Inc.* v. *Lutnick,* 313 F.3d 704, 710 (2d Cir. 2002)). Here, while the alleged injury was felt by insureds residing throughout the country, it was felt predominantly in Illinois, which had the most residents enrolled in Participating Plans. Thus this court will apply Illinois law to the IF's negligence claim.

### B.        Whether the IF Has Stated a Claim Upon Which Relief Can Be Granted

The IF brings a single negligence claim against all Defendants. To state a claim for negligence in Illinois, "a plaintiff must establish the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach." *Doe* v. *Coe*, 2019 IL 123521, ¶ 50, 2019 WL 2218925, at *8 (Ill. 2019).

Defendants make two arguments as to why the IF has failed to plead that they owed duties to the AEU Plan and the Participating Plans: (1) the IF's allegations here are foreclosed by judicial admissions that the harm to the plans was caused by third parties; and (2) the IF has failed to sufficiently plead a "professional relationship" between Defendants and the plans such that a duty would exist. (Dkt. 21 at 11-12.)

### i. Whether the IF's Claims Are Barred By Judicial Admissions in the Related Litigation

Defendants' first argument begins from the premise that the IF has brought separate claims against Locke Lord, LLP, and brokers engaged by AEU, in which the IF asserts that those entities' wrongful actions caused, in whole or in part, the losses suffered by the AEU Plan and Participating Plans. (Dkt. 21 at 12.) Defendants argue that the IF's assertions that Locke Lord and the brokers acted negligently are judicial admissions binding on it in this suit. (*Id.* at 12–13.) Defendants conclude that the IF fails to state a claim against them because the IF's dispute is with Locke Lord and the brokers, and Defendants had no duty under Illinois law to protect the plans from Locke Lord and the brokers' negligence. (*Id.* at 11 (citing *Ziemba* v. *Mierzwa*, 566 N.E.2d 1365, 1369, 142 Ill. 2nd 42 (Ill. 1991) ("the imposition of a general duty to anticipate and guard against the negligence of others would place an intolerable burden on society")).)

This argument fails because "pleadings in one suit are not binding judicial admissions in [an]other." *United States* v. *Romero*, No. 14-cv-07643, 2016 WL 5404606, at *4 (N.D. Ill. Sept. 28, 2016) (citing *Enquip, Inc.* v. *Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981)). Indeed, "there's no rule against inconsistent pleadings in different suits, or for that matter a single suit." (*Id.* (quoting *Peterson* v. *McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012)); *see also* Fed. R. Civ. Proc. 8(d)(3). That principle disposes of Defendants' argument.

Furthermore, the IF's allegations in the instant complaint are not only that Defendants failed to take appropriate steps to guard against the negligence of others, but that they were themselves negligent in the performance of duties they owed the plans. (*See* Dkt. 33 at 26; Dkt. 8 at ¶¶ 41, 45, 60, 75, 82, 85, 88.) Of course, there can be multiple proximate causes of the same harm. *Leonardi* v. *Loyola Univ of Chicago*, 658 N.E.2d 450, 455, 168 Ill. 2d 83 (Ill. 1995).

### ii. Whether Defendants Owed a Duty of Care to the Plans and Whether the Economic Loss Doctrine Bars Liability

The closer question is whether the IF has sufficiently alleged that Defendants owed a duty to the plans that is not barred by the economic loss doctrine. The Illinois Supreme Court has "long held that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Skaperdas* v. *Country Cas. Ins. Co.*, 28 N.E.3d 747, 754, 2015 IL 117021, ¶ 25 (Ill. 2015) (internal punctuation omitted) (quoting *Simpkins* v. *CSX Transp., Inc.*, 965 N.E.2d 1092, 1097, 2012 IL 110662, ¶ 19 (Ill. 2012)). In determining whether a duty of care exists, Illinois courts also apply "the negligence principle of affirmative undertaking," which provides that "a person who begins a service for another must exercise reasonable care in performing it to avoid injury to the beneficiary of the undertaking." *Id.* at 756 (citing *Talbot* v. *Country Life Ins. Co.,* 291 N.E.2d 830, 8 Ill.App.3d 1062, 1065 (Ill. App. Ct. 1973)).

The IF argues that Defendants owed the plans a duty of care because of the "comprehensive relationship" between them. (Dkt. 33 at 23–24.) Defendants allegedly engaged aggregators to solicit employers, controlled the marketing materials to be provided to the employers, and were responsible for underwriting and obtaining stop-loss coverage for the plans employers created. The argument that the negligent performance of those acts created a foreseeable risk of harm has facial plausibility.

The IF concedes, however, that the plans suffered only economic harm (dkt. 33 at 26) and thus the court must determine whether Illinois' economic loss doctrine bars the claim. *See Moorman Manuf'g Co.* v. *Nat'l Tank Co.,* 435 N.E.2d 443, 450–51, 91 Ill. 2d 69, 86 (Ill. 1982).

That doctrine holds that a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial transaction is generally limited to any remedies it may have under a contract and cannot recover in tort. *Id.; Congregation of the Passion, Holy Cross Province* v. *Touche Ross & Co.*, 636 N.E.2d 503, 515, 159 Ill. 2d 137, 164 (Ill. 1994). As a practical matter, the doctrine functions to limit the duties people owe to each other under Illinois law, and thus courts sometimes analyze the applicability of the doctrine and the question of whether a duty exists together. *See Cmty. Bank of Trenton* v. *Schnuck Markets, Inc.*, 887 F.3d 803, 812 (7th Cir. 2018) ("The issue in these cases . . . is duty, in the sense that tort law generally does not supply additional liabilities on top of specified contractual remedies") (internal punctuation omitted).

The economic loss doctrine arose in the context of product liability cases, based on the rationale that permitting recovery for an unsatisfactory product outside of bargained-for contractual remedies and carefully drawn UCC rules would disincentivize contract formation and unduly submit manufacturers to liability of "unknown and unlimited scope." *Congregation of the Passion*, 636 N.E.2d at 513; *see also Cmty. Bank of Trenton*, 887 F.3d at 812 ("Courts see no reason to intrude into the parties' allocation of the risk when bargaining should be sufficient to protect the parties' interests, and where additional tort law remedies would act as something of a wild card to upset their expectations"). Following *Moorman*, the Illinois Supreme Court extended the doctrine's applicability beyond the product liability arena to bar certain claims arising from the provision of services. *Congregation of the Passion*, 636 N.E.2d at 514. The Court also has articulated four exceptions to the doctrine,[18] which this court recently summarized as follows:

---

[18] Some opinions—including at least two from the Seventh Circuit—list only three exceptions to the economic loss doctrine, as the Illinois Supreme Court did in *First Midwest Bank, N.A.* v. *Stewart Title Guar. Co.*, 843 N.E.2d 327, 333, 218 Ill. 2d 326, 337 (Ill. 2006), *In re Chicago Flood Litig.*, 176 Ill. 2d

(1) where the plaintiff sustained damage, *i.e.* personal or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.* fraud; (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions; [and (4)] where a service professional has duties to his client that arise independently of his contractual duties.

*Mercola* v. *Abdou*, 223 F. Supp. 3d 720, 729 (N.D. Ill. 2016).

---

179, 199, 680 N.E.2d 265, 275 (Ill. 1997) and *Fireman's Fund Ins. Co.* v. *SEC Donohue, Inc.*, 176 Ill. 2d 160, 165, 679 N.E.2d 1197, 1199 (Ill. 1997). *See Cmty. Bank of Trenton*, 887 F.3d at 813; *Catalan v GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011); *Integra Healthcare*, 2019 WL 3766122 at *4. But the Illinois Supreme Court in those cases was referring only to the exceptions expressly articulated in *Moorman*, and not exceptions subsequently recognized for claims of professional negligence and breach of fiduciary duty, which are well-established in the case law. *See Metro. Water Reclamation Dist. of Greater Chicago* v. *Terra Found. for Am. Art*, 13 N.E.3d 44, 59, 2014 IL App (1st) 130307, ¶ 58 (Ill. App. Ct. 2014) (discussing the three exceptions articulated in *Moorman* and stating, "[f]ollowing *Moorman*, courts recognized other situations in which the doctrine is inapplicable"); *Warczak* v. *Attorneys' Title Guar. Fund, Inc.*, 2015 WL 3884451, at * 15, 2015 IL App (2d) 140677-U, ¶ 60 (Ill. App. Ct. 2015) (unpublished) ("The fourth exception to the *Moorman* doctrine pertains to situations where a service provider's duty is extracontractual"); *Aaron Transfer & Storage, Inc.* v. *Bekins Van Lines, Inc.*, No. 02 C 1836, 2002 WL 31509775, at *2 (N.D. Ill. Nov. 12, 2002) (claims for breach of fiduciary duty are exempt from the economic loss doctrine because they sound in contract, agency, and equity). The Illinois Supreme Court certainly has never disavowed the extracontractual duty exception articulated in *Congregation of the Passion. See Am. Family Mut. Ins. Co.* v. *Krop*, 120 N.E.3d 982, 996, 2018 IL 122556, ¶ 58 (Ill. 2018) (Theis, J., dissenting) ("[W]e have explained that, where the duties owed arise outside of the contract, the plaintiff may seek recovery in *tort* for breach of those independent duties") (emphasis original). The Seventh Circuit also has recognized the continuing viability of that exception. *Wigod*, 673 F.3d at 567-68.

Some opinions also treat general negligence claims, such as professional negligence claims, as falling within the third exception articulated in *Moorman*, which by its terms applies only to negligent *misrepresentation* claims. *See Freedom Mortg. Corp.* v. *Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 993 (N.D. Ill. 2010). Other opinions apply principles applicable to the fourth exception to negligent misrepresentation claims. *Haimberg*, 5 Fed. App'x at 549. The court generally agrees that the nature of the cause of action—negligence vs. negligent misrepresentation—is less important to the application of the *Moorman* doctrine than the relationship between the parties. *See Wigod*, 673 F.3d at 567 ("To determine whether the *Moorman* doctrine bars tort claims, the key question is whether the defendant's duty arose by operation of contract or existed independent of the contract"). Under the third exception, other types of defendants in addition to those listed in the main text above have been held susceptible to suit on the grounds that they were "in the business of supplying information for the guidance of others." *See Am. Inter-Fid. Corp.* v. *M.L. Sullivan Ins. Agency, Inc.*, No. 15 C 4545, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases and listing inspectors, title insurers, real estate brokers, stock brokers, and others).

Addressing these exceptions, the IF first argues that its claims fit under the third exception, applicable to negligent misrepresentations made by one in the business of supplying information for the guidance of others. (Dkt. 33 at 27.) But the IF makes no serious argument that it has stated a claim for negligent misrepresentation rather than a claim for negligence. While the IF has alleged that Defendants made misrepresentations to the Plans, that allegation is devoid of any specifics that would allow the court to treat it as well-pleaded.[19]

The fourth exception, however, is at least analogous to the circumstances presented here. The Illinois Supreme Court in *Congregation of the Passion* described the circumstances in which a service professional owes an extracontractual duty as follows:

> Whether the professional produces a legal brief or a financial statement, the value of the services rendered lies in the ideas behind the documents, not in the documents themselves. In contrast to the relationship between an attorney or accountant and their client, the relationship between an architect and his client produces something tangible, such as a plan that results in a structure. The characteristics of a tangible object are readily ascertainable, and they can be memorialized in a contract and studied by the parties. The characteristics of something intangible, however, are much more amorphous than the characteristics of something tangible. It is not necessary or generally possible to memorialize all the elements of "competent representation" in a contract. What is necessary to competently represent a client will normally vary with different situations and cannot be anticipated before performance begins. Further, the law has not traditionally required that these elements be included in the retention contract. Application of the *Moorman* doctrine limiting recovery of purely economic losses to contract, therefore, is inappropriate where a relationship results in something intangible.

*Congregation of the Passion,* 636 N.E.2d at 514–15.

---

[19] The IF's brief argues repeatedly that Defendants "provided inaccurate information" and made "misrepresentations" to the plans but makes little effort to identify any such statements beyond citations to large swaths of its complaint. (*See, e.g.*, Dkt. 33 at 15.) Such putative misrepresentations as the court is able to identify are pleaded in a conclusory fashion. (*See, e.g.,* Dkt. 8 at ¶ 82 ("Defendants allowed the AEU Program to be marketed as insurance that would pay all covered claims in exchange for payment of monthly insurance premiums by Participating Plans").) Moreover, nowhere does the IF allege that the plans or the employers that formed the plans relied on any misrepresentations by Defendants. Thus the complaint fails to state a claim for negligent misrepresentation.

Courts examining this opinion have emphasized that whether an extracontractual duty exists depends on whether a defendant's work produces an intangible, purely informational product, and whether the work requires a "degree of discretion and independence," or "knowledge and expertise," that "cannot be memorialized in a contract and studied by the parties." *Fireman's Fund*, 679 N.E.2d at 1201; *Haimberg* v. *R & M Aviation, Inc.*, 5 Fed. App'x 543, 548 (7th Cir. 2001); *Tolan & Son, Inc.* v. *KLLM Architects, Inc.,* 719 N.E.2d 288, 308 Ill.App.3d 18 (Ill. App. Ct. 1999); *Mercola*, 223 F. Supp. 3d at 730. Applying those principles, Illinois courts have held the exception applies to attorneys, accountants, insurance brokers, and surveyors. *Collins,* 607 N.E.2d at 1189 (attorneys); *Congregation of the Passion,* 636 N.E.2d at 515 (accountants); *Kanter* v. *Deitelbaum*, 648 N.E.2d 1137, 1140, 271 Ill. App. 3d 750, 755 (Ill. App. Ct. 1995) (insurance brokers);[20] *Rozny* v. *Marnul*, 250 N.E.2d 656, 663, 43 Ill.2d 54 (1969) (surveyors). This court also has held that the exception extends to financial advisers.[21] *Mercola*, 223 F. Supp. 3d at 730; *see also Chicago Hous. Auth.* v. *J.A. Hannah In*v. *Advisory Ser*v.*, Inc.*, No. 95-cv-5251, 1996 WL 328033, at *7 (N.D. Ill. May 9, 1996).

The court here concludes the Illinois Supreme Court likely would apply the exception in this case.[22] There is no dispute that, to the extent Defendants had any role in the insurance program at issue, they were providing purely intangible services. According to the IF's

---

[20] More recent cases have noted that an extracontractual duty applies to insurance brokers by operation of a statute that became effective in 1997. *Mercola*, 223 F. Supp. 3d at 730 (citing 735 Ill. Comp. Stat. 5/2-2201).

[21] *But see Integra Healthcare*, 2019 WL 3766122, at *5 (stating that courts have not applied the exception beyond the "narrow range" of attorneys and accountants) (citing *Dahm* v. *First Am. Title Ins. Co.*, No. 06 C 5031, 2008 WL 1701901, at *3 (N.D. Ill. Apr. 9, 2008)).

[22] A federal court's role in deciding questions of state law is "to predict how the highest courts of the respective states would answer them." *Cmty. Bank of Trenton*, 887 F.3d at 811.

allegations, Defendants' role in the program bore aspects of serving as an insurance agent or broker (marketing the program to clients through Black Wolf), a plan administrator (directing the use of plan contributions), and a plan fiduciary (underwriting and setting contribution rates).[23] Each of those roles requires specialized knowledge and expertise, and the exercise of discretion.

The principle of affirmative undertaking also supports the existence of a duty of care. Given that the IF alleges Defendants were the force behind the AEU Program and were involved in nearly every aspect of it, it follows that they owed a duty of care to ensure the program functioned appropriately.

Defendants argue that any advisory services they provided to the plans were merely as an "informational conduit" for advice devised by Locke Lord, LLP, but that argument is not based on the allegations in the IF's complaint, and thus it is not an argument Defendants can win on a motion to dismiss. (*See* Dkt. 44 at 3–4) (discussing the IF's claims against Locke Lord).

With respect to the Defendants' role in marketing the program, the court notes the Illinois Insurance Placement Liability Act places certain duties on "insurance producers"—typically insurance brokers or insurance agents—to procure appropriate insurance for people who have requested coverage. 735 Ill. Comp. Stat. 5/2-2201; *see Skaperdas*, 28 N.E.3d 747. As relevant here, those duties include obligations to provide accurate information to insureds and to warn them where there is reason to believe that an insurer will be insolvent. *AYH Holdings, Inc.* v. *Avreco, Inc.*, 826 N.E.2d 1111, 1131, 357 Ill. App. 3d 17, 39 (Ill. App. Ct. 2005); *see also Vertex Ref., NV, LLC* v. *Nat'l Union Fire Ins., Co. of Pittsburgh, PA*, No. 16 CV 3498, 2017 WL 977000, at *5 (N.D. Ill. Mar. 14, 2017) ("In short, an insurance producer which is cavalier about

---

[23] The court notes that the IF does not allege that Defendants were fiduciaries as defined by ERISA and, conversely, Defendants do not argue that ERISA preemption applies to the IF's claim.

the accuracy of the information it provides to a party seeking coverage can hardly be said to have exercised ordinary care"). Liability for violations of those duties can extend beyond insurance producers under the doctrine of *respondeat superior*. *Skaperdas*, 28 N.E.3d at 758.

While the IF makes no argument that Defendants are subject to liability under the statute, Illinois common law imposed a duty of care on insurance brokers even before the statute went into effect, and the Illinois Supreme Court has continued to rely on common-law principles in construing the statute. *See Kanter*, 648 N.E.2d at 1140, *Skaperdas*, 28 N.E.3d at 751 (holding that a captive insurance agent[24] owes a duty of care to prospective insureds under the statute, relying in part on the common-law principle of affirmative undertaking). The court is willing to accept the idea that Illinois common law still imposes a duty of care on entities such as Defendants, who (according to the complaint) engaged in a somewhat unorthodox insurance business that may not fit neatly within the statutory scheme.[25] *See Mercola* v. *Abdou*, 223 F. Supp. 3d at 730 ("whether they are construed as claims against an insurance broker or against a

---

[24] Under Illinois law a captive insurance agent has a fixed relationship with an insurance company and owes a fiduciary duty only to that company, not to a client requesting coverage. *Skaperdas*, 28 N.E.3d at 751. A captive insurance agent stands in contrast to an insurance broker, which has no fixed relationship with a single insurance company and rather is employed by an insured and owes it fiduciary duties. *Id.*

[25] Defendants point out that the Seventh Circuit has stated: "After the enactment of § 2–2201, Illinois courts considering negligence claims against insurance brokers have been reluctant to expand the duties of brokers and agents beyond those articulated in the statute. Generally, a duty to the insured arises only after specific coverage is requested, and courts have not considered negligence claims grounded in more general negligence principles outside the scope of § 2–2201(a)'s language." *M.G. Skinner & Assocs. Ins. Agency, Inc.* v. *Norman-Spencer Agency, Inc.*, 845 F.3d 313, 320 (7th Cir. 2017); *see also Landmark Am. Ins. Co.* v. *Deerfield Constr., Inc.*, No. 15 C 1785, 2016 WL 2977274, at *8 (N.D. Ill. May 19, 2016) (surveying "Illinois state court decisions on the exhaustiveness of section 2201's duties"). But *M.G. Skinner* addressed the question of whether duties beyond those articulated in the statute existed as to a party that was clearly an insurance producer. It did not address the question of what duties might apply to entities in the insurance business that do not fall under that definition.

financial advisor, the [plaintiff's claims] fall within the extracontractual duty exception to the *Moorman* doctrine").

That said, further litigation may show that the economic loss doctrine does bar the IF's claim. *Chicago Housing Auth.*, 1996 WL 328033, at *7 (denying motion to dismiss while noting economic loss doctrine ultimately may bar liability). In particular, the court observes that there are nearly no written agreements in the record at this time that might shed light on how the multiple parties involved in this complex insurance arrangement assigned responsibilities and risks among themselves.[26] The existence of any such agreements may paint a different picture of the IF's tort claim. *See Cmty. Bank of Trenton*, 887 F.3d at 815 ("Given this network of contracts and contractual remedies . . . [we] doubt the wisdom of recognizing new, supplemental liabilities without a clear sense of why they are necessary.")

### iii.     Whether the IF's Claim Against Wray Sounds in Legal Malpractice

Finally, Wray argues that the IF fails to state a claim against her because its negligence claim challenges legal advice she provided AEU, and the IF lacks "standing" to challenge that advice. (Dkt. 21 at 14.) Wray relies on cases holding that "for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." (*Id.* at 15 (quoting *Pelham* v. *Greisheimer*, 440 N.E. 2d 96, 92 Ill. 2d 13 (Ill. 1982)).

That rule does not apply, however, where an attorney causes harm to a plaintiff by her direct action, separate and apart from advice she gives to a client. Here, the IF has alleged that Wray took a variety of actions related to the plans that were separate from any legal advice she

---

[26] Defendants submitted an Administrative Claims Services Agreement between AEU Holdings and Tall Tree Administrators, LLC, and an Administrative Services Agreement between AEU Benefits and Benefits Plan Administrators, Inc. (Dkt. 20-4 at 74, 102)

may have provided to AEU, such as guiding employers on how to set up VEBA trusts and providing direct instructions to Black Wolf about how to handle plan contributions. Those allegations do not sound in legal malpractice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (dkt. 19) and motion to strike certain allegations in the Moore Declaration (dkt. 41) are denied.

Date: September 4, 2019

_____
U.S. District Judge Joan H. Lefkow